BOSWORTH et al. v. CHICAGO, M. & ST. P. RY. CO. et al.[1]

(Circuit Court of Appeals, Seventh Circuit. February 25, 1898.)

Nos. 442, 452, 453, and 454.

**1. CARRIERS OF GOODS—DESTRUCTION BY FIRE—DELIVERY.**

A railroad operated by defendant as receiver, being without yard facilities or switching engines at its terminus, in East St. Louis, entered into a contract with a terminal company having yards and tracks and connecting with St. Louis, by which such company, for a stipulated charge, agreed to furnish to the railroad the necessary yard room and track facilities, and the necessary switch engines and yard men for making up and breaking up its freight trains. It was the custom, in operating under this contract, for the terminal company to take cars of freight arriving, and place them on its tracks, where they remained until a new waybill was furnished to it by the defendant, and were then transferred according to its directions. In case of freight consigned to St. Louis, it was the custom of defendant to notify the consignee on its arrival, and, on receipt of directions from such consignee, to issue the waybill to the terminal company, designating the point of delivery. It appeared that the terminal company, to increase its transfer business across the river, had offered to dealers in barley in St. Louis to hold upon its tracks free of charge cars received by it, until the barley should be sold, but it did not appear that defendant knew of such arrangement. Certain cars loaded with barley, the shipments being induced by this arrangement, and also a car, No. 1,004, consigned to a point in Alabama, came over defendant's road, and were taken by the terminal company, and placed on its tracks, where it usually placed defendant's cars. While standing upon such tracks, where some of them had remained for several days, the cars were destroyed by fire through the negligence of the terminal company. No waybills for any of such cars had been issued by defendant. *Held*, that as to the cars loaded with barley and their contents defendant was not liable. Woods, J., holding that, under the arrangement between the consignees and the terminal company, which, in the absence of their dissent, was binding on the shippers, there was a delivery by defendant when the cars came into the actual possession of the company. Showalter, J., concurring on the ground that the taking possession of the cars by the terminal company with knowledge that the shipment over defendant's line had been completed, and that they were to be moved over its tracks to some point of delivery or connection, constituted a delivery to it as connecting carrier. Jenkins, J., dissenting on the ground that there was no delivery by defendant, which relieved him of liability as a carrier, until shipping directions had been given to the terminal company, that company having no authority to move or deliver the freight until the receipt of such directions, and only in accordance therewith. As to car 1,004, *held*, that there was no delivery, and defendant was liable for its loss. Showalter, J., dissenting.

**2. SAME—CONTINUOUS CARRIAGE.**

When a car load of goods is shipped for continuous carriage over connecting lines, the initial carrier is not relieved of responsibility by merely delivering possession of the car to the connecting carrier, but his liability for a loss continues until he has also delivered shipping directions to the latter. Showalter, J., dissenting.

[1] Rehearing denied April 1, 1898.

Appeals from the Circuit Court of the United States for the Southern District of Illinois.

These appeals are from decrees against the appellant, C. H. Bosworth, as receiver of the Chicago, Peoria & St. Louis Railway Company, in favor of interveners in the case of the Mercantile Trust Company against the Chicago, Peoria & St. Louis Railway Company, wherein the receiver was appointed, for damages caused by the burning of freight cars and their contents, of which the appellant is alleged to have had possession as a common carrier, on the evening of October 28, 1894, at East St. Louis. By an amendment the petitions were made to charge that, while the cars were still in the possession of the receiver at East St. Louis, he negligently caused and permitted them to be placed in proximity to a wooden warehouse filled with baled and loose hay, which was exposed to fire from passing locomotives, and in some manner caught fire, which, communicating to the cars, caused the damage complained of. The amounts decreed to be paid to the interveners, respectively, were: To the Chicago, Milwaukee & St. Paul Railway Company, $9,033.73; to Jacob Rau, $1,144.07; to the Hunting Elevator Company, $2,600.95; to the Carr, Ryder & Engler Company, $777.26; and to others, not parties here, whose decrees it has been agreed shall abide the result of these appeals, various sums, aggregating nearly $10,000. The facts, in the main, were agreed upon; and the controlling question is whether the cars and goods at the time of destruction were in the possession of the receiver, or had passed into the possession of the Terminal Railroad Association of St. Louis, which owned the tracks upon which the cars were standing when they were consumed. It appears that, not having adequate yard facilities of its own at East St. Louis, the Chicago, Peoria & St. Louis Railway Company on August 1, 1892, entered into an agreement with the terminal railroad association for the use of its tracks, and, either by acquiescence or by formal stipulation, that agreement remained in force between the terminal association and the receiver. Only the first, fourth, and fifth clauses need be quoted:

"It is agreed that the party of the first part [the terminal railroad association] shall furnish the necessary yard room and track facilities in their yards in East St. Louis, Illinois, as now located, and the necessary switch engines and yard men to do the switching of the party of the second part in the making up and breaking up of all freight trains that depart from and arrive at East St. Louis, and to furnish storage room for a reasonable number of cars necessary to properly take care of and handle the business of the party of the second part, not exceeding one hundred and fifty (150) cars at any one time; and the charge for the facilities and the work above named shall be at the rate of fifty (50) cents per loaded car in and out, except cars on which the party of the first part receives a bridge toll, which will be handled free; empty cars in and out free." "Fourth. All cars consigned to and from the East St. Louis freight house of the party of the second part to be switched to and from the Wiggins Transfer tracks without extra charge. Regular switching charges and rules to apply on all other cars to and from connections; the party of the first part to be governed in making its collections by instructions shown on billing to it as to who should pay. In the absence of any instructions the switching charges will follow the car. Fifth. The party of the first part to furnish track room upon which the engines of the party of the second part can be switched and cared for and turned as may be required; the care of such engines to be under the supervision of the party of the first part; the price for the service rendered to be agreed upon by the master mechanic of the party of the first part and the superintendent of motive power and machinery of the party of the second part."

"These tracks of deposit," says the master's report, "were not exclusively used by the C., P. & St. L., but the cars seem to have been always placed upon them." It is apparent from the evidence, however, that the receiver had no voice in determining where a car should be placed, or with what care it should be guarded.

For the purpose of saving the labor and expense of making proof, the parties stipulated that the property described in the several petitions was destroyed as stated: that the Carr, Ryder & Engler Company, a corporation, on October 20, 1894, delivered the property described in its petition to the Chicago, Milwaukee

& St. Paul Railway Company at Dubuque, Iowa, loaded in car No. 1,004 of the Rock Island & Peoria Railway Company, and consigned for transportation as per bill of lading to the May & Thomas Hardware Company, Birmingham, Ala., by way of East St. Louis, Ill.; that the Chicago, Milwaukee & St. Paul Railway Company was the owner of the 38 cars described in its petition; that during the evening of October 28, 1894, those cars, while on the tracks of the Terminal Railroad Association of St. Louis, commonly used by the receiver under the agreement between that association and the Chicago, Peoria & St. Louis Railway Company, dated August 1, 1892, were damaged by fire to the total amount of $9,033.73; that the cars were consigned as per bills of lading and waybills introduced in evidence; that Jacob Rau, of Wykoff, Minn., at the times and places alleged in his petition delivered to the Chicago, Milwaukee & St. Paul Railway Company two car loads of barley, consigned to the Orthwein Grain Company, St. Louis, Mo., by way of East St. Louis, Ill.; that receipts, in the form of exhibits attached to the stipulation, were given by the railway company at the time the barley was received for transportation; and that when destroyed the barley belonged to the petitioner, and was of the value of $1,144.07. The stipulation in respect to the shipment of the Huntting Elevator Company is in the same words, except that the consignee named is the Teichman Commission Company, and the value of the goods destroyed is stated to have been $2,650.95. Like stipulations were made concerning the cases of other interveners, from whose decrees there has been no formal appeal. The agreement was afterwards amended by striking out the clause in respect to the ownership of the barley shipped by the several petitioners, except Rau and one other, whose consignments were for sale on commission.

It is contended by the appellant that the destination of the cars consumed, except five, as shown by the waybills and receipts or copies thereof introduced in evidence by the interveners, was East St. Louis, although in the column under the head of "Marks and Consignees" the name of the consignee, and the words "St. Louis, Missouri," appear. The shipments of barley, except those for sale on commission, were made in pursuance of telegraphic correspondence showing offers of net prices by the brokers or commission men at St. Louis, accepted by the shippers; and it is contended by the appellant that on delivery of the grain to the carrier the title passed to the consignees, and that the interveners have no right of action. On the other hand, proof was offered to show that delivery at St. Louis was intended by the parties, and that on that understanding other shipments were made after the fire in lieu of those destroyed. At the time of the fire, the cars destroyed, together with others which were injured and afterwards repaired, had been on the tracks of the terminal association for various periods of time,—one since the 28th day of September preceding,—and of those received in October there arrived on the 10th, 1; on the 16th, 1; on the 24th, 4; on the 25th, 18; on the 26th, 12; on the 27th, at 7:55 a. m., 9; at 6:44 p. m., 2; and on the 28th, at 6:55 a. m., 4; at 1:45 p. m., 1; and at 2:57 p. m.. car 1,004. Of the aggregate number (54), all but 8 were cars of the Chicago, Milwaukee & St. Paul Railway Company.

In respect to the manner in which the cars brought in over the receiver's road were handled and disposed of by the employés of the receiver and of the terminal association under their agreement, it appears that after an incoming train had been broken up, and the cars placed on the tracks of the terminal company, they remained there, in the physical control of that company, until the consignee, to whom the receiver was accustomed to send prompt notice of the arrival of a car consigned to him, should indicate the particular destination, which might be on the east or west side of the river, or a point on the line of another railroad, whereupon the receiver would make out and deliver to the terminal company a new waybill, on which that company would transfer the car as directed. It appears further that on the delivery of such a new waybill, and not sooner, it was the custom of the receiver, if the car belonged to another company, to send notice to that company that the car had been delivered to the terminal association; it being the custom of railroad companies in that way to keep each other advised of the disposition and whereabouts of their respective cars. It satisfactorily appears further that it was the custom of brokers and buyers at St. Louis to leave in the cars, until sold, certain classes of goods, and particularly consignments of barley received upon the tracks of the terminal railroad

association, whether billed to St. Louis or East St. Louis; the mode of selling goods so held being by samples taken on the arrival of cars by agents of the consignees employed to visit daily the yards for that purpose. It further appears that the receiver at the hearing before the master made a statement of facts which he proposed to prove by some of the consignees of the barley in question, and asked time to produce the witnesses, and that in order to avoid delay it was agreed by the interveners that, if produced, the witnesses would testify, as stated by counsel for the receiver, to the effect following: "That the terminal railroad association personally solicited this particular barley business, originating on the Chicago, Milwaukee & St. Paul Railroad, upon which this controversy is pending; that these solicitations by the terminal railroad association were made to all barley dealers in St. Louis to whom the particular consignments of barley were made which are now in litigation; that the terminal railroad association, as an inducement to barley dealers and shippers, agreed to hold the cars on their tracks at East St. Louis, and offered other facilities in and about their yards at East St. Louis, by which the St. Louis Terminal Railroad Association succeeded in securing the business of all the shippers (by that term I mean the consignees and shippers), except the business of the John Wall Commission Company, whose business was being handled by the Wiggins Ferry Company, a competing line with the St. Louis Terminal Railroad Association, and that at a later day they also secured the business of this last-named firm; and that this solicitation was made in the interest of the terminal railroad association, for the express purpose of having the business sent down the east side of the Mississippi river, so as to give them the benefit of the transportation across the river at East St. Louis to St. Louis, in competition with lines west of the Mississippi river."

In a general report of the master touching all the cases, it is said "that no notice was sent to the owner, shipper, or consignor of the arrival of said cars at St. Louis, or of the delivery of them to the terminal railroad"; and, in the special report upon the case of Jacob Rau, it is said, concerning his cars, that "no notice of their arrival was given to owner." It is not reported that the consignee of any car was not notified by the receiver, and did not otherwise have knowledge, before the fire, that the car had arrived, and was upon the terminal tracks, subject to his order. On the contrary, the proof is that the consignees received from the shippers immediate notice by mail of each consignment, and in addition received a sample of the grain, which, according to the report, the shippers were accustomed to send by express. Informed in this way of the number and contents of a car in transit, the agent of the consignee in regular and daily attendance in the yards for that purpose was able to take, and, there being no evidence to the contrary, presumably did take, the required sample from each car promptly upon arrival. This conclusion is fortified by a letter of the Orthwein Grape Company to one of the interveners, in which it is said, "Two of your cars [giving the numbers] arrived this afternoon," and by the testimony of Rau to the effect that his consignee had possession of samples of his grain taken from the cars on the day of their arrival at East St. Louis. The proof, in addition to the facts stated, being that notice of the arrival of cars was regularly and promptly sent to the consignees by the employés of the receiver, the fair inference, in the absence of contrary evidence, is that notices of the arrival of the cars in question were sent, and were duly received by the consignees.

Bluford Wilson, for appellants.

Burton Hanson, for appellees.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

WOODS, Circuit Judge (after making the foregoing statement). If the facts were simply that under the agreement of 1892, and in accordance with the custom which had grown up, cars from the receiver's road were taken by the terminal association and placed upon its tracks, and permitted to remain there until the receiver, at the request of the consignee, should make out and deliver to the terminal association

new waybills showing a particular destination, it would perhaps be true, as contended in behalf of the interveners, that the responsibility of the receiver for the cars, with their contents, which were destroyed, had not ceased, because the waybills under which they could have been transferred had not been made out. But, besides the fact of the custom, the undisputed evidence is that shipments of barley originating on the Chicago, Milwaukee & St. Paul Railroad, including the consignments in dispute, were made to or by way of East St. Louis in order that the cars should come into the possession of that association for transfer in pursuance of an understanding amounting to an agreement between the association and the consignees that the association should hold the cars on its tracks, and afford other facilities about its yards at East St. Louis, until the consignee of a car should determine and give notice to what point the transfer should be made. That agreement was equivalent to a specific direction by the consignee upon the receipt of each car by the terminal association that the car should be held for further orders; and in that situation, whatever otherwise might have been his duty, the receiver was under no obligation to notify the consignee of the arrival of a car, and it is not material whether such notice was given or not. The delivery to the terminal association was complete, and no delay in making out new waybills, or in sending junction notices to the owners of the cars, if owned by other companies, could be of force to show a continued legal or constructive possession by the receiver. The consignees, whether buyers of the grain or agents of the shippers, it is well settled, had authority, in the absence of notice to the contrary, to direct what disposition should be made of the cars on their arrival at East St. Louis, and the legal result is the same as if the terminal company's possession and detention of the cars had been with the consent or by direction of the interveners themselves. In view of the custom which prevailed, and of the agreement between the terminal association and the consignees of barley at St. Louis, the liability of the receiver as carrier ceased once the cars had been placed upon the terminal tracks. From that time the question was not whether the placing of the cars upon its tracks by the terminal association operated to transfer the liability of a carrier from the receiver to the terminal association, but was whether the liability of a bailee for hire, or as warehouseman, was on the receiver, or on the terminal association. It is doubtless true, in a general sense, that the shipper of goods, or the owner of goods shipped, is entitled to the common-law liability of the carrier until the goods shall have reached their destination; but that right, it must be clear, does not exist when the course of transportation is not to be continuous, as when, to the knowledge and with the consent of the shipper, there must be on the way a place and period of storage; and, when the right exists, it is one which the shipper or his agent, the consignee, may waive, and in this case it was waived by the consignees when they agreed and directed that the cars and contents should be held on the terminal tracks to await their specific orders for transfer. If the original destination was St. Louis, and was so intended by the shippers, no notice of any restriction upon the authority of the consignees

to change the destination was given; and when by their direction the
course of transit was broken or suspended the liability of the carrier
ceased, and under the facts, as they appear, the liability of bailee com-
menced, on the part either of the receiver or of the terminal associa-
tion, and the question is, on which? It does not solve this question to
say that the action of the terminal association, under its contract with
the receiver to break up trains and to remove the cars to certain
tracks, did not constitute a delivery. Under that contract, and under
the custom which had prevailed, if the proof went no further, it is
conceded that the terminal association would have been under obliga-
tion to obey the orders of the receiver with respect to the cars; but
when, in addition to that contract and the custom, it is shown that
the terminal association was under a separate agreement with the
consignees (to which the receiver was not a party, and of which it
does not appear that he had knowledge) to hold on its tracks all cars
consigned to them, until they should give notice of the desired trans-
fer, a radically different case is shown. Under that agreement it
was not material, nor was it contemplated, that the terminal asso-
ciation should know of the final destination of any car, or of its con-
tents, until the time for transfer should come. The purpose of the
agreement was to leave the destination undetermined until the last.
No liability as common carrier could attach to the terminal associa-
tion until a forward movement or transfer of the car should be or-
dered; and there being, as already explained, no question of liability
as a carrier, the question of formal delivery, as affecting the existence
of such liability, or its transfer from one company to the other, was
in no sense involved. Whether the receiver, either in ignorance of
the agreement of the association with the consignees, or for other
reason growing out of the custom of business between the two com-
panies, supposed himself to be in some sense responsible for the con-
signments in question, is not material. Neither is it important, if
true, that the terminal association undertook to furnish terminal
or yard facilities which it was the duty of the receiver's company
to provide. If otherwise there would have been such a duty on the
receiver, he was relieved of the duty in respect to these cars by force
of the agreement between the consignees and the terminal association.
To a consignee who has provided a place for the receipt and storage
of his goods a carrier is certainly under no obligation to afford like
facilities; and if, by reason of an independent contract, the carrier
has a right to make delivery or to store goods in the same place pro-
vided by the consignee, the carrier does not on that account remain
responsible to that consignee for the safety of his goods after deposit-
ing them in that place. These consignees having bargained with the
terminal association to hold their cars upon its tracks, the tracks be-
came theirs for that purpose, just as much as otherwise they would
have been the tracks of the receiver under his agreement with the
terminal association; and, the cars having been placed upon those
tracks, the receiver's possession and responsibility ceased, as they
would have ceased if the cars had been placed on private tracks of
the consignees; and whether waybills had been handed over, or re-

mained in the possession of the receiver, could be of no possible significance.

The principles of law underlying these propositions, if they are not to be regarded as elementary, are well established and familiar, and are quite in harmony with the opinion in Mt. Vernon Co. v. Alabama G. S. R. Co., 92 Ala. 296, 8 South. 687, and other cases to which reference has been made. See, also, Pratt v. Railway Co., 95 U. S. 43. While it is conceded that ordinarily there must be a continuous liability as common carrier upon somebody until the goods have arrived at their destination, manifestly the rule does not apply when, as here, the shipper, through his agent, the consignee, has consented to an interruption of the course of transit, and to the holding of the goods meanwhile by a bailee of his own selection. The supposed difficulty with the proposition that the terminal association was still in possession, because it did not know that these cars were for St. Louis, nor to whom they were consigned, nor whether they might not be intended for the Wiggins Ferry Company, and in the usual course of business could not know until waybills had been delivered to it, is not substantial. There is no evidence that the association did not in fact know that the cars were for consignees in St. Louis for whom it had agreed to hold cars. The evidence shows that sometimes the agents of the association at the instance of consignees called for cars for which no waybills had been requested of the receiver 'by the consignees. If the information had been deemed important, it was easy to obtain it from the consignees and their agents, and doubtless from the agents of the receiver, without waiting for the time of transfer, when, customarily, waybills were called for and delivered. The information, however, was not in fact important, because until the particular destination of a car had been determined by the consignee the responsibility of the association as bailee was only for ordinary care, and could not be greater or less whether the name of the consignee or the destination of the car were known or unknown. Indeed, the association, under its contract with the receiver, was under the same liability to the receiver, if the receiver remained liable to the owner; and on no possible supposition or theory is it perceived that its liability could be affected by its knowing or not knowing whether particular cars came within the scope of its agreement with the consignees at St. Louis. Besides, it was not a part of the agreement that the terminal association would hold for the consignees cars received upon its tracks, which it knew to be, or when it knew them to be, so consigned. Such a limitation upon the scope of the agreement is not even suggested by the evidence, would be in itself unreasonable, and presumably was not in the mind of either party. Even under the agreement with the receiver, the actual possession and physical control of the cars passed immediately upon arrival to the terminal association; and, if consigned to parties for whom the association had agreed to hold them, there is no reason suggested for continued liability of the receiver, in any character, except the lack of the mere formality of making out and delivering to the terminal association a waybill, which, in the course of business, could not be

made out until the consignee, in his own pleasure, should give the necessary direction; and, if that had been done, the terminal association would have become liable, as a carrier, to make an immediate transfer to the place, or in the direction, of ultimate destination. In other words, on the theory that the terminal association's liability to the consignees or shippers could arise only upon receipt, in the usual course, of waybills from the receiver, it could never have become liable as bailee under its agreement with the consignees to hold the cars for them, and could have incurred liability only as a carrier to make transfers as ordered. It is evident, moreover, that the receiver was not bound to make out new waybills, and might have avoided this formal objection to his discharge from liability, if he had known of the agreement of the terminal association with the consignees, by de livering or tendering the original waybills on the arrival of the cars, or at a later time to the terminal association; but that, again, would have been only a formality, without substantial effect upon the relations or rights of the parties, and therefore was not necessary. It is perhaps true that, if the responsibility of the receiver had not ceased, the owners, whether consignees or shippers, would have had their election to sue the receiver for a breach of contract as bailee, or the terminal association for negligently causing the injury; but, having themselves entered into an understanding with the terminal association whereby it was to hold the goods for them, they necessarily waived any right to look further to the responsibility of the receiver; and, upon the destruction of their property through the fault of the terminal association in exposing it to what the master has characterized as a veritable fire trap, they had, upon the facts disclosed, and presumably have yet, a clear right of action against that association upon its contract with them; and in such an action, if brought, the association could hardly be heard to say that no liability had arisen under that contract because it had not received waybills, or did not know to whom the cars had been consigned.

If it appeared that the receiver had knowledge of the agreement between the terminal association and the consignees, the plain, if not necessary, inference would be that it was merely for the convenience of the parties that the receiver did not give the original waybills, or copies, to the terminal association upon the arrival of cars, but waited until the consignees had determined the final destination, and then made out new waybills; and, if it be assumed that the receiver was ignorant of that agreement, it is no less clear that the terminal association and the consignees, solely for their own convenience, continued, according to the custom, not to call upon the receiver for waybills until by the determination of the consignees the cars were to be forwarded; and the legal consequence should be and is the same as if the receiver had possessed full knowledge of the situation, or, if there be a difference, it is in the receiver's favor. The principle involved is well illustrated, upon a converse state of facts, in the case of St. Louis, I. M. & S. Ry. Co. v. Commercial Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554. There the owners of cotton destroyed by fire, and the railroad company which was sued, were, as here, in separate contract relations with the Union Compress Company, which, like the terminal association

here, held the goods as bailee either for the owner or for the railroad company. Pursuant to a custom which had grown up for the convenience of all parties, the railway company had been in the habit of giving to the owners of cotton, in exchange for the receipts of the compress company, through bills of lading, before the cotton had been loaded upon the cars, and had been accustomed to give the compress company notice of the fact of loading, with direction in each instance to ship the cotton on the railroad by a route and to an address named; but in this case no bill of lading had been given, and, before loading, the cotton was burned. The railroad company was charged with a negligent failure, though often requested by the compress company, to furnish transportation according to its contract with that company; and one of the questions in the case was how far the railway company's liability in the action was affected by the fact that it had issued bills of lading for other cotton, which formed a part of the accumulated mass which was burned in the street,—no waybill having been given for the 340 bales for the destruction of which the suit was brought. "This cotton, certainly," says the opinion, "was in the exclusive possession and control of the compress company. · The railway company had not assumed the liability of a common carrier, or even of a warehouseman, with regard to it; had given no bills of lading for it; had no custody or control of it, and no possession of it, actual or constructive; and had no hand in placing or keeping it where it was." And, speaking directly in respect to the effect of the issuing of bills of lading upon the company's liability for cotton covered thereby, the court said:

"There is nothing else in the case which has any tendency to show that the railway company had or exercised any control or custody of the cotton, or of the place where it was kept by the compress company, before it was put upon the cars by that company. * * * The evidence warranted, if it did not require, the inference that the bills of lading were issued merely for the convenience of all parties, and with no intention of making any change in the actual or legal custody of the cotton until it was so loaded. California Ins. Co. v. Union Compress Co., 133 U. S. 387–415, 10 Sup. ·Ct. 365. Upon the facts of this case, it may well be doubted whether the liability of the railway company as a common carrier began before the cotton had been received upon its cars, and had thereby come into its actual and exclusive possession and control."

In California Ins. Co. v. Union Compress Co., referred to above, in respect to a similar issue of bills of lading it is said:

"At most, the railroad companies, by acquiring the receipts of the plaintiff and issuing bills of lading for the cotton, took only constructive possession of it; and the plaintiff, retaining actual and physical possession of it, did not lose any element of possession necessary to give it the right to effect insurance for its own benefit."

So, here, upon the facts stated, the nondelivery of waybills by the receiver to the terminal association, in any view, can constitute evidence only of constructive possession, and, since in that respect a waybill is less significant than a bill of lading, should not, in view of the agreement between the consignees and the terminal association, be deemed to be controlling, or even persuasive, evidence of continued possession, even constructive, on the part of the receiver, and of consequent responsibility for the safe-keeping of the cars. Two things are necessary to the beginning of liability as a carrier, namely, delivery

(that is to say, a transfer of the physical possession of the goods) and shipping directions, while to the initiation of liability merely as a bailee for hire notice of ulterior destination is unimportant, and only possession of the goods is essential. And it is on this distinction that upon a delivery thereof into the possession of the terminal association the liability of the receiver ceased, and that association, if any one, became responsible for such cars and contents as were covered by its agreement with the consignees, whether it had or had not received notice of the ultimate destination of particular cars.

It is conceded that a railroad company is responsible for the cars of another company in use upon its road, under the same rule of liability as for the goods carried therein; and it follows that, not being responsible in these cases for the contents of the cars of the Chicago, Milwaukee & St. Paul Railway Company, the receiver is not responsible for the loss of the cars themselves.

The agreements and the custom under which cars were transferred at East St. Louis, of course, had no application to the case of the Carr, Ryder & Engler Company, and the decree in favor of that company was right. No cessation in the course of carriage was contemplated, and, by the rule that the liability of one carrier in a continuous transit does not cease until the liability of the connecting carrier begins, the receiver must be held responsible for the loss of the goods of that company. Though in physical possession, under its agreement with the receiver, of the car in which the goods were being transported, the terminal association had not become responsible as a carrier therefor, because it had not been put in possession of a waybill or other form of information on which it could proceed with the carriage. In respect to that car, no interruption in the course of transit having been contemplated or authorized either by the shippers or by the consignees, it may be said that the receiver, as one of the connecting carriers, was under the double duty—it would perhaps be proper to say as agent for the shipper—to deliver possession and to communicate shipping directions to the next carrier; and that duty, in one aspect, not having been performed, his liability as carrier had not ceased.

JENKINS, Circuit Judge (concurring). I concur that the appellant should be held liable for the destruction of the property contained in car numbered 1,004, and this because he had not divested himself of his liability as insurer by delivery of the car and its contents to the next succeeding carrier. The owner or shipper of goods to be carried over connecting lines of railway is entitled to the protection afforded by the common-law liability of a carrier until the goods have arrived at their destination, and a reasonable time has elapsed after their arrival to accept delivery of them; and, with respect to connecting lines, each carrier assumes the responsibility of an insurer while the goods are in transit over its particular line, and until delivery to the next succeeding carrier. Railroad Co. v. Manufacturing Co., 16 Wall. 318; Railroad Co. v. Jones, 155 U. S. 333, 339, 15 Sup. Ct. 136. What shall constitute a delivery which relieves the one carrier from, and imposes upon the succeeding carrier, the burden of an insurer of the property in transit, has been the subject of some contention in the

87 F.—6

courts.    The result of the discussion has been, as I think, to estab-
lish a rule that is at all times protective to the shipper or owner, and
imposes the burden of insurer upon the carrier, with whom it should
properly be lodged.    No better expression of the rule can be found
than that declared by the supreme court of Alabama (Clopton, J.,
delivering the opinion) in Mt. Vernon Co. v. Alabama G. S. R. Co., 92
Ala. 296, 298, 8 South. 687:

> "The duties and obligations of the common carrier do not commence until
> there has been a complete delivery of the goods,—until they are placed in his
> custody, and under his exclusive control,—for immediate transportation.    Though
> the goods may be delivered, if transportation is to await shipping orders or
> directions, or some act to be done by the consignor before they are forwarded,
> or if they cannot be at once put in transitu, because of the failure of the shipper
> to give shipping orders or directions, the carrier is liable only as bailee until
> such orders and directions are given, or until he is informed to what place the
> goods are to be forwarded, and to whom delivered.    The strict responsibility
> of a common carrier arises concurrently with the duty of immediate transporta-
> tion, and this duty does not arise so long as anything remains to be done by the
> consignor before the goods can be intelligently started on the route to their
> destination.    Barron v. Eldredge, 100 Mass. 455; O'Neill v. Railroad Co., 60
> N. Y. 138; Hutch. Carr. §§ 3282–3288.    The same rule is applicable in the case
> of connecting carriers.    The responsibility peculiar to the common carrier is not
> devolved on the next connecting carrier until the receiving carrier has delivered
> the goods to the former, with directions for their shipment,—the place of desti-
> nation, and to whom consigned.    Until this is done the relation of common car-
> rier is not established between the shipper and the connecting carrier."

The facts in that case are similar to those in the cases under con-
sideration.    The East Alabama Railway Company received certain
cotton, and issued a bill of lading for through transportation from
Gadsden, Ala., to Mt. Vernon Switch, Md., over its own and con-
necting roads.    The receiving carrier transported the cotton from
Gadsden to Attalla, at which place the lines of the two companies con-
nected; and the car containing the cotton was placed upon a side track
of defendant,—the East Alabama Railway Company having no side
track at that point.    No notice was given to defendant's agents at
Attalla that the cotton was placed on a side track for through ship-
ment, nor was there any name or address of the consignee, nor any
waybill or shipping directions, sent with the cotton, or to the agent of
defendant, until after the cotton was burned, which occurred during
the night of the third day after its arrival at Attalla.    It was held
that there had been no delivery, and that the liability of insurer had
not been assumed by the defendant company.    See, also, Reynolds v.
Railroad Co., 121 Mass. 291; McDonald v. Railroad Corp., 34 N. Y.
497; Condon v. Railroad Co., 55 Mich. 218, 21 N. W. 321; Conkey v.
Railway Co., 31 Wis. 619.    The result of this rule is that before a de-
livery can be deemed completed the succeeding carrier must be invested
by the preceding carrier with the possession and exclusive control of
the property, and that for immediate transportation.    The liability of
the succeeding carrier commences only when that of the preceding
carrier has terminated.    A delivery is not consummated by merely
placing the car upon the tracks of the succeeding carrier; for such
carrier is not by that act informed of the destination of the car, and
cannot, therefore, give it immediate transportation.    The delivery of
a bill of lading or waybill without delivery of possession would confer,

at most, only a right to ultimate possession (California Ins. Co. v. Union Compress Co., 133 U. S. 387–415, 10 Sup. Ct. 365), and would not impose upon the succeeding carrier the liability of an insurer until delivery of actual and exclusive possession and control. Railway Co. v. Knight, 122 U. S. 79, 93, 7 Sup. Ct. 1132; St. Louis, I. M. & S. Ry. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554; Railway Co. v. McFadden, 151 U. S. 155, 160, 14 Sup. Ct. 990. So, also, the mere physical possession, without shipping directions, would not impose such liability, although the company might be liable for the goods as bailee, because the goods must be delivered into the carrier's exclusive possession and control, for immediate transportation, and the duty of immediate transportation could not arise until the delivery of proper shipping directions. There must concur the possession and exclusive control, and the necessary directions essential to immediate transportation, before the character of insurer can attach to the connecting carrier. Until these conditions have been performed by the delivering carrier, he is not absolved from liability as insurer. In the cases before us it appears that the appellant was without yard facilities or switching engines at the end of his line at East St. Louis. Under contract with the terminal association, the latter undertook, for a consideration stated, to furnish him with yard facilities and with switch engines to break up his incoming trains, and to place his cars upon certain designated tracks belonging to the terminal association, there to await further directions with respect to their destination. The terminal association had no means of knowing the destination of the cars until such further directions were given. This was accomplished by means of the delivery of waybills stating the name of the consignee and the place of destination. In doing this work of switching and placing the cars, the terminal association acted as the agent of and for and in behalf of the receiver. While the cars so stood upon the designated tracks they were in the possession and under the control of the receiver, and not of the terminal association. A completed delivery could only be made, according to the usual course of business between the two lines, by the delivery of a waybill indicating the destination of the goods, the amount of advance charges, the name of the consignee, and taking receipts for them. Then, and not until then, was the terminal association invested with the possession and exclusive control of these goods. Then, and not until then, was the duty of immediate transportation imposed. This was the uniform course of business between the connecting carriers, concerning which there is no disputation in the evidence, fortified by the fact that the receiver's company, accustomed to make daily reports to other companies of delivery of their cars to connecting carriers, did not report such cars as delivered until waybills had been given to the terminal association, and its receipts taken for the cars. The initial placing of the cars by the terminal association upon its tracks under its contract with the receiver's company was merely the act of an agent performing for the principal a duty devolving upon him, and which he was unable to perform except in that way. It was the act of the receiver by his agent, and was not a delivery of the car for transportation to a succeeding carrier.

As I read the case of Pratt v. Railway Co., 95 U. S. 43, the facts being considered, it is in full accord with the position here assumed. Without doubt the custom of business established between two connecting carriers may largely control in the application of the rule, since such custom may determine the agreement of the carriers with respect to acts which shall constitute a delivery. In that case, as not here, the goods were placed within the exclusive control of the succeeding carrier. There the presence of the goods in the precise locality agreed upon for the deposit of goods for transportation over the lines of the succeeding carrier, with the address of the consignees upon them, sufficiently indicated that they were for transportation over its line of railway. Not so here, for the cars were placed upon tracks set apart for the accommodation of the receiver, and the terminal association was without knowledge of consignee or destination of the cars, or whether they were to be transported over its line at all. There the goods were deposited by the one party, and received by the other, for transportation. Not so here, because the car was placed by the terminal association under its contract for the accommodation of the receiver, and without further direction it was not possible for the terminal association to know whether the car was for transportation at all over its lines, or whether it should be transferred to the Wiggins Ferry Company. There, by the custom of business, it was the duty of the succeeding carrier, with respect to goods deposited in the particular place for transportation, to call upon the preceding carrier for waybills. Not so here, for the duty of delivering a waybill was cast upon the receiver. There the liability as insurer was denied because the goods had been delivered to the succeeding carrier for proper carriage.

I am of opinion that the like rule should be applied with respect to the car loads of barley consigned to parties in the city of St. Louis, unless the liability of insurer had been interrupted by some act of the consignor or consignee. It will be observed that the transit of the barley was not ended upon the arrival of the cars at the end of the receiver's line of road at East St. Louis. It was still to be transported over other and connecting lines to its destination. The barley was still in transitu. The record discloses that it was the custom of the receiver, with respect to goods consigned to the city of St. Louis, upon their arrival at East St. Louis to give immediate notice to consignees, and take their directions to what part of the city of St. Louis the goods should be forwarded, and by what line,—whether by the lines of the terminal association, or by the lines of the Wiggins Ferry Company, two rival companies, whose lines of railway connected with the road of the receiver. The master's report in the principal case states "that no notice was sent to the owner, shipper, or consignee, of the arrival of said cars at St. Louis, or of the delivery of them to the terminal railroad." The appellant has cast upon him the burden of showing that he has fulfilled his contract of carriage; that upon the arrival of goods, according to the custom of business, he had notified the consignees, and taken their directions with reference to the further carriage of the goods. It is not shown that this notice was given, and the master reports that it was not. This phase of the case, however, need not be dwelt upon; for, assuming that notice had been given,

and no instructions received within a reasonable time, the liability of the receiver as a common carrier was discharged, but liability as warehouseman was assumed. The goods were still in his custody and under his control. They had not been delivered to the terminal association for further carriage, or for any other purpose. The cars were placed upon the tracks designated as the yard tracks of the receiver, and were there for his accommodation. The terminal association had no control over them. It was not advised of the destination of those cars, or of the consignees. Until such advice, it could not rightfully take possession of them, nor rightfully transport them, nor safely deliver them. They might be for transportation over the Wiggins Ferry Company, its rival; and the terminal association was bound by its contract with the receiver to furnish switch engines for the transportation of those cars, and their delivery to the Wiggins Ferry Company, when so ordered. If, in the case supposed, the receiver held them merely as warehouseman, he is still liable, for his answer asserts that the cars were placed in close proximity to a "veritable fire trap"; so that, whether the receiver is to be regarded, with respect to his obligation, as insurer or as warehouseman of these goods and these cars, he is liable for their destruction.

It is held by the presiding judge that by reason of a certain supposed agreement between consignees in St. Louis and the terminal association, to the effect that the latter, as an inducement to barley dealers to ship over its lines, would hold cars containing shipments to such consignees on the tracks of the terminal association at East St. Louis, the receiver was absolved, and liability under such agreement imposed upon the terminal association, so soon as these cars had, under the contract with the receiver, been placed upon the tracks designated for the accommodation of the receiver's cars. I am unable to concur in this conclusion. I have sought to show that there had been no delivery of these cars to the terminal association. It had not knowledge of their destination. It had not knowledge of the consignees of them. They were subject to the direction and control of the receiver. The terminal association, under its contract with the receiver, had placed these cars upon these tracks for the receiver, and for a compensation agreed upon. It therein was the agent of the receiver. It could not know whether these cars were to be transported over its line, or the lines of the Wiggins Ferry Company. It could not know in what direction they were to be transported, or their ultimate destination. When it had placed the cars on these tracks pursuant to its contract with the receiver, it had nothing further to do with them until the receiver had dispossessed himself of possession and control, and had invested the terminal association therewith. I cannot comprehend that the general agreement between the terminal association and consignees can become operative, with respect to the contents of these cars, until delivery to the terminal association, and it had been invested with the exclusive possession and the exclusive control of them. The force of the reasoning is not perceived, whereby it is held that, because in fact these goods were ultimately to go to persons who had contracted with the terminal association,—of which contract the receiver had no knowledge,—therefore these goods were held under that con-

·tract before delivery in fact to the terminal association, and before it was invested with exclusive control of them. I do not undertake to say that the terminal association may not be liable to the receiver for its negligent acts causing the fire whereby this property was destroyed. Neither the question nor the party is before us. The question here is whether the receiver is absolved from liability; whether, failing a delivery of the cars to the terminal association, failing a surrender by the receiver of control over them, with ignorance upon the part of the terminal association of their destination or their consignees, the agreement between the terminal association and the consignee had become operative with respect to these goods. I think not. If the receiver had directed that the terminal association, under its contract with him, should transfer these goods to the Wiggins Ferry Company, his order must have received recognition and have been carried out by the terminal association; and it cannot be doubted that up to the time of the fire in question the goods were so subject to the receiver's direction and control. For these reasons I think that the decrees appealed from should be affirmed.

SHOWALTER, Circuit Judge. The failure of appellant touching any obligation on his part to give proper shipping directions to the connecting carrier is not set up as a ground of action in any one of the petitions. The cause of action alleged in each is that he was a common carrier, and that the property therein specified, which was negligently or accidentally destroyed by fire, was at the time of such destruction still in his possession as bailee for carriage. Counsel for appellees say:

"The pleadings raise a single issue: Were the cars and their contents, at the time they were destroyed, in the possession of appellant, as receiver of the Chicago, Peoria & St. Louis Railroad Company, or had they been delivered by him to the next succeeding carrier, the Terminal Railroad Association of St. Louis? Appellees claim that the cars and their contents had not been delivered to the terminal railroad association at the time of the fire, but were in the possession of appellant, while appellant contends that he had made a delivery of them, and therefore is not responsible for the loss and damage which the fire caused. The sole question for decision, therefore, is, had there been a delivery of the cars and their contents by appellant to the terminal railroad association at the time of the fire?"

Referring to all the cars in question, other than the one mentioned next below in this opinion, they say further:

"These cars and their contents having been consigned to St. Louis, a point beyond the end of the receiver's route, the duty of the receiver was, when he received them into his possession at Peoria, to carry them safely to East St. Louis, the end of his road, and there deliver them to the terminal association, the next succeeding carrier. The obligation to safely deliver these cars and their contents to the terminal association was just as imperative as the obligation to carry them safely, and until he made such a delivery he held this property as a carrier."

On October 20, 1894, the Carr, Ryder & Engler Company, a corporation of Dubuque, Iowa, delivered to the Chicago, Milwaukee & St. Paul Railway Company a quantity of doors, sashes, and blinds, loaded in a car numbered 1,004, which belonged to the Rock Island & Peoria Railway Company. This freight was consigned, by way of

East St. Louis, to the May & Thomas Hardware Company, Birmingham, Ala. The Chicago, Milwaukee & St. Paul Railway Company hauled this car to Rock Island, Ill., and there delivered it to the Rock Island & Peoria Railway Company. This latter company hauled the car to Peoria, and there delivered it to the Peoria & Pekin Union Railway Company. By this latter company the car was taken to Pekin, Ill., and there delivered to this appellant receiver, operating the road of the Chicago, Peoria & St. Louis Railway Company, who hauled the same to a point immediately beyond the terminus of his own rails at East St. Louis, and on the rails of the Terminal Railroad Association of St. Louis; reaching that point about 3 o'clock on the afternoon of October 28, 1894. Servants of the Terminal Railroad Association of St. Louis, in the usual course of their employment by that company, then hauled the car to a certain customary halting place on the premises of their employer; using for the purpose an engine which belonged to their employer. Here they left said car stationary till the evening of that day, when it was destroyed by fire. In the usual course of business the terminal association, after obtaining from the receiver a waybill or memorandum indicating the ultimate destination of said car, would have hauled the same over its own rails in East St. Louis, or over rails subject to its control for that purpose, and delivered the same to a carrier on whose line the transit south was to continue. When the initial carrier, the Chicago, Milwaukee & St. Paul Railway Company, received this car, it gave a receipt to the shipper, containing certain terms and conditions expressly applicable to the transit over its own line. Each intermediate and connecting carrier took the car, not by virtue of any express contract with the shipper or consignee, but of its legal obligation as a carrier to accept and carry, and safely deliver at the end of its line to the next succeeding carrier. The appellant here is not liable for the loss of the car by any express contract with the shipper or consignee. From the standpoint of the shipper or consignee of car 1,004, the terminal association was a connecting carrier to haul the car from the terminus of appellant's rails to the point in or near East St. Louis whence the next succeeding carrier would take it south. Appellant was bound for the safety of the car until it went into the care of the terminal association. Appellant was also required to indicate to the terminal association the destination, and possibly the route selected south from East St. Louis. This information would be given by means of a memorandum called a "waybill." The strong contention by appellees is that, because no waybill was tendered by appellant to the terminal association before the destruction of the car, appellant must be deemed in possession at the time of the loss; in other words, that the terminal association could not be treated as in possession until it had received the waybill. The terminal association, as said, in fact took, and at the time of the loss had, the custody and care of the property. So far as appears, the haul over its tracks from the point where appellant's servants parted from the car to the point where the loss occurred, was a portion of the transit to be made, in any case, no matter what the ultimate destination of the car might be. For the purpose of moving the car thus far, the

information as to the ultimate destination which a waybill would have given was not needed. It does not appear that the lack of such information contributed in any way to the loss. It does appear that, in the peculiar carrying business conducted by the terminal association, the car in question would remain for a time stationary, and thereafter be hauled, probably with other cars grouped for the purpose, to the starting place of the carrier who was to take it south. Information as to the ultimate destination and route had not as yet been actually imparted by appellant to the terminal association. But the latter was content for the time being to treat such information then in the possession of appellant as sufficiently available to itself. The theory that appellant remained constructively bailee for carriage, it is fair to say, is urged in connection with a document showing certain contract relations between appellant and the terminal association. The first, fourth, and fifth sections of that document have been quoted in the opinion of the presiding circuit judge. The preamble is in words following:

·"Whereas, the party of the first part undertakes to give the party of the second part terminal facilities at East St. Louis, Illinois, for the handling of its trains, care of its engines and cars, and the handling and care of its freight, under the following terms and conditions," etc.

The second and third sections and the last paragraph, being the remainder of the contract in question, are quoted below:

"Second. Cars made 'bad order' by and during the making up and breaking up of trains of the party of the second part to be repaired by the party of the second part, and the party of the second part shall furnish its own car inspectors. All cars made 'bad order' outside of the yards set aside for the use of the party of the second part shall be repaired by the party causing the damage. Third. For all loads to and from the National Stock Yards, the party of the second part is to pay the party of the first part one (1) dollar per car in and out, inclusive of the charge for making up and breaking up of trains, but not the trackage charge at National Stock Yarks. This contract to be in force from and after the 1st day of August, 1892, and to continue for six months from that date, and to be renewed from time to time, as desired, at the expiration thereof, if satisfactory to both parties."

No yards, nor any special place or territory in any yards, were "set aside" by the terminal association "for the use of" the receiver, in the sense that he exercised any dominion over, or had any possessory right to, the same. The servants of the terminal association may have been accustomed to haul cars from the receiver's road to some special territory in the yards of the terminal association, and that territory may for the time being have been "the yards set aside for the use of" the receiver, within the sense of the second section of the contract. But said servants did not do this by any direction from the receiver; nor was any right in him to direct or control them, or to designate the place on the grounds or rails of the terminal association where any car received from his road should be at any given time, in any way recognized. This was the construction given to the contract and acted on by the parties. The document in question was not a conveyance. I do not find in it any transfer of any estate in its grounds or tracks, or any part thereof, or of any possessory interest in its engines, or control over its servants, from the

terminal association to the receiver. That the receiver had no such interest or estate is more obvious here than that in Pratt v. Railway Co., cited below, the Grand Trunk Railway Company had no proprietorship of any kind over any part of the station house of the Michigan Central Railway Company. The fifth paragraph of the contract apparently licenses the receiver to enter the premises of the terminal association to look after such of his engines as may be there for the time being. But the receiver had no possessory estate of any sort in any part of the property of the terminal association.

A shipper who sends freight over a given line of road, whether operated by a single carrier, or by independent and connecting carriers, has the right to needful terminal facilities for unloading his goods. In paying the freight charge, he pays for such facilities, if in his case they are needed. But what carrier provides them is, from his standpoint, an immaterial matter. If the goods are carried to the neighborhood of the place of destination by one carrier, and the terminal facilities made use of there to haul the goods from the terminus of such carrier's rails to the place of destination, or to a new starting place for further transit, are provided by another, the freight charge to the shipper will be the same for the two as if both the road of the first carrier, and the property, rails, fixtures, and equipment of the second, belonged to a single carrier. Assuming that the rails of this receiver terminated at a point in East St. Louis, but that at this point they connected with the rails of the terminal association, and that the latter company owned or possessed terminal facilities, and a system of what may be called intramural roads, by which it hauled cars to points in St. Louis, and to the termini in and about St. Louis or East St. Louis of the roads of various other carriers leading from these cities in different directions, and that the terminal association was in the business of receiving and hauling freight over its lines to other lines, and to various points of ultimate destination in the neighborhood, then the terminal association would be a connecting carrier, and would be subject to all rules of law governing that business. The case of Walker v. Keenan, 34 U. S. App. 691, 19 C. C. A. 668, and 73 Fed. 755, concerned the matter of terminal facilities. Counsel for the defeated party in that case made application to the supreme court of the United States for a writ of certiorari. The sole matter of controversy was the true meaning and significance of the Covington Stock Yards Case, here called to our attention by appellees' counsel, and referred to below in this opinion. The certiorari was denied. 164 U. S. 706, 17 Sup. Ct. 1002. A contract between this appellant and the terminal association regulating the charges which the terminal association might receive for the business done by it on its own road is nothing more than a division of the freight charge between the two connecting carriers. As said above, the shipper pays no more than if the appellant had himself owned and operated the lines of the terminal association. Such a contract could not interfere with or modify the legal obligation of either carrier to a shipper whose goods are handled successively by both. Neither appellant nor the terminal association could evade or alter any legal obligation to a third party by any contract between themselves. If

the terminal association had alienated to appellant an actual owner-ship or possessory right over that portion of its tracks where the cars in controversy were destroyed, and such a control over its employés and engines that said employés when engaged in handling the cars in question were the servants of appellant, and the engine used by them his engine for the time being, the case would be different. On this hypothesis the tracks where the cars were destroyed would have been appellant's tracks, the employés who hauled the cars to that point his servants, the engines used by them his engines. He would have continued to be the bailee of the property, and the matter of waybills or junction reports would have signified nothing. But in my judg-ment, as said, the contract in question had no force as of alienation by the terminal association to appellant of any possessory right, in-terest, or estate in or over any property of the former company, or of any control over its servants. Neither the relation of lessor and lessee, nor that of licensor and licensee, existed between these par-ties, as resulting from said contract, so far as it concerned the cars and contents in question.

In the Covington Stock Yards Case, 139 U. S. 128, 11 Sup. Ct. 461, it was ruled, in effect, that a carrier bringing cattle to a consignee who had provided himself with structures connecting his yards with the railroad track, whereby cattle might be unloaded directly from the cars into his yards, could not refuse to unload the cattle of such con-signee into the yards, and by means of the appliances provided by him, for the mere purpose of compelling him to pay a terminal fee at the cattle yards provided by the company, or provided by an in-dependent corporation. This case, as I conceive, has not here the application and significance suggested by counsel for appellees. Of the cars in question, one was to go to Birmingham, Ala.; the others, loaded with barley, to different points in and about St. Louis, as directed by the consignees. Appellant did not engage to furnish unloading facilities for these cars. He was under no obligation to these appellees to provide terminal facilities for unloading. He handled the cars and freight as an entirety. So far as concerns any one of the cars here in question, when the terminal association took possession the appellant, as a carrier or bailee, no longer had any control. No one of these cars would again come into his custody, unless the owner of such car, or of the property therein contained, should see fit to reship the same back over his road. Appellant had brought the cars in controversy safely to the end of his line, and the terminal association had hauled them over its tracks to the place of loss. Appellant had ceased to be bailee of these cars, or any of them, and the terminal association had become such bailee. The terminal association had voluntarily accepted all these cars from appellant, knowing them to be at the time of such acceptance in transit. They were upon the tracks of that company, and would be moved thereafter by that company, by its servants using its engines, and over its tracks, or over tracks under its control for that purpose. It matters not that the information upon which the latter company would act in the fur-ther transit of car 1,004 was still to come from appellant, or that the information touching the different points in St. Louis where the cars

of barley were wanted by the consignees might also come through appellant. Ultimate shipping directions, as between appellant and the terminal association, were regulated by an understood course of dealing between them. Such a car, for instance, as 1,004, would in any case, and by reason of the peculiar character of the carrying business conducted by the terminal association, remain for a time stationary on its premises. It mattered not whether the ultimate shipping directions were contemporaneous with the delivery, or some hours later. Following the custom which had prevailed between the two carriers, appellant had not at the time of the loss sent the ultimate shipping directions. But for the destruction of this car, appellant would have given the shipping directions within ample time to suit the convenience of the terminal association in moving the car on to the starting place of the next succeeding carrier. Such shipping directions as appellant was able to give concerning any of these cars were at all times available to the terminal association. Concerning some of the cars consigned to parties in St. Louis, the evidence seems to show that by arrangement between the consignees and the terminal association the place on the premises of the company where the loss occurred might be, or might become, the place of final destination.

As between an intermediate and a connecting carrier, that one, I take it, which was in fact bailee of the goods when the loss occurred, is answerable to the owner. The owner is not required to work out theories of constructive possession, or of constructive nondelivery, resting on some understanding or mode of dealing between the two which he might have difficulty in finding out or proving. But the method or course of dealing whereby an intermediate carrier conveys shipping directions to a connecting carrier is a different matter. It is due to the owner that such directions be given, so that his goods may go on, and without needless delay. If this requirement be answered, I do not see how the owner is concerned with the method or custom of dealing on that matter which the two carriers find convenient. As between the owner or shipper and the initial carrier, goods are not in transit until the destination has been made known, so that the transit may commence. But, when goods are once in transit, then, barring exceptional circumstances not necessary to the discussion, they remain in transit until the final destination is reached, and some one carrier in the line of connecting carriers is always subject to the obligations of a bailee for carriage. A connecting carrier may receive and load into his own cars goods which he knows are to be carried by him, and thereafter take from the preceding carrier the shipping directions. He may even carry such goods to a specified point on his own road, to which he knows they must be carried in any event, and there receive the shipping directions. If he be content with such a course of dealing between himself and the previous carrier on the matter of shipping directions, I do not see why he did not become bailee for carriage when he received the goods, why the delivery by the preceding carrier was not then complete, or how the owner could sustain any hurt from such method of dealing between the two carriers. In Pratt v. Railway Co., 95 U. S. 43, the goods had been shipped from Liverpool to St. Louis. The packages were marked,

"P. & F., St. Louis." The goods were carried by the defendant, the Grand Trunk Railway Company, from Montreal to Detroit, and there they were destroyed by fire. On a state of facts as quoted in full below, delivery to the connecting carrier, the Michigan Central Railroad Company, was predicated, and the defendant held clear of liability:

"At the time the fire occurred the defendant had no freight room or depot at Detroit, except a single apartment in the freight depot of the Michigan Central Railroad Company. Said depot was a building several hundred feet in length, and some three or four hundred feet in width, and was all under one roof. It was divided into sections or apartments, without any partition wall between them. There was a railway track in the center of the building, upon which cars were run into the building, to be loaded with freight. The only use which defendant had of said section was for the deposit of all goods and property which came over its road, or was delivered for shipment over it. This section, in common with the rest of the building, was under the control and supervision of the Michigan Central Railroad Company, as hereinafter mentioned. The defendant employed in this section two men, who checked freight which came into it. All freight which came into the section was handled exclusively by the employés of the Michigan Central Railroad Company, for which, as well as for the use of said section, said defendant paid said company a fixed compensation per hundredweight. Goods which came into the section from defendant's road, destined over the road of the Michigan Central Railroad Company, were at the time of unloading from defendant's cars deposited by said employés of the Michigan Central Railroad Company. in a certain place in said section, from which they were loaded into the cars of said latter company by said employés when they were ready to receive them, and after they were so placed the defendant's employés did not further handle said goods. Whenever the agent of the Michigan Central Railroad Company would see any goods deposited in the section of said freight building set apart for the use of the defendant, destined over the line of said Central Railroad, he would call upon the agent of the defendant in said freight building, and from a waybill exhibited to him by said agent he would take a list of said goods, and would then, also, for the first time, learn their ultimate place of destination, together with the amount of freight charges due thereon. That from the information thus obtained from said waybill in the hands of the defendant's agent a waybill would be made out by the Michigan Central Railroad Company for the transportation of said goods over its line of railway, and not before. These goods were on the 17th of October, 1865, taken from the cars and deposited in the apartment of said building used as aforesaid by the defendant, in the place assigned as aforesaid for goods so destined. At the time the goods in question were forwarded from Montreal, in accordance with the usage in such cases, a waybill was then made out in duplicate, on which was entered a list of said goods, the names of the consignees, the place to which the goods were consigned, and the amount of charges against them from Liverpool to Detroit. One of these waybills was given to the conductor who had charge of the train containing the goods, and the other was forwarded to the agent of the defendant in Detroit. On arrival of the goods at Detroit the conductor delivered his copy of said waybill to the checking clerk of defendant in said section, from which said clerk checked said goods from the cars into said section. It was the practice of the Michigan Central Railroad Company before forwarding such goods to take from said waybill in the custody of said checking clerk, in the manner aforesaid, the place of destination and a list of said goods, and the amount of accumulated charges, and to collect the same, together with its own charges, of the connecting carrier."

It will be seen from the foregoing statement that on the course of dealing between the two carriers shipping directions had not been received by the connecting carrier. The court mentions the mark on the goods, but not as a controlling factor in the decision. The Michigan Central Railroad Company did not look at the marks on the goods for the shipping directions upon which it acted. Under the

mode of dealing between the two carriers, the case was the same as though there had been no marks on the packages. The goods were on the platform of the connecting carrier at the time of the loss. The defendant did not own or have any possessory right over that portion of the connecting carrier's station house. Defendant's servants were not privileged either to unload the goods there, or to handle the goods afterwards. The servants of the connecting carrier placed all goods which were to be forwarded, as identified by defendant's checking clerk, at a particular locality on the platform in question. The defendant ceased to be, and the connecting carrier became, the bailee of the goods; and this before the shipping directions had been given by the one carrier to the other according to the understood mode of dealing between them. This was a case in which the defendant did not own or possess the unloading platform. If the defendant had owned or possessed that section of the station where the goods were unloaded, the mere placing the goods in controversy at a particular locality on the platform, from which the servants of the connecting carrier would afterwards, without special license from the defendant, take them, would not have changed the custody of such goods. The law upon this point is clear. Nor would the connecting carrier have become bailee, even if its agent had received the shipping directions before the destruction of the goods. The fact that the goods were still in the custody of the defendant would, from the standpoint of the shipper, have determined the matter. I may add that the Grand Trunk Railway Company had no terminal (that is to say, unloading) facilities at Detroit, so far as concerned the owner of the goods in question. The section of the station in which the freight of the Grand Trunk Railway Company was unloaded was owned and possessed by the connecting carrier. In the case at bar the connecting carrier not only took exclusive possession of the cars in controversy at the terminus of appellant's rails, but hauled them to a point on its own rails to which appellant had, neither in law nor by contract, even a right of access. In Conkey v. Railway Co., 31 Wis. 619, the defendant carried goods marked with the name of the consignee, and with the place of destination, "Preston, Minn., via La Crosse & Lanesboro," from Milwaukee to La Crosse, and there unloaded the same into its own station or freight house. From the latter point the goods were to be taken by the connecting carrier, the Southern Minnesota Railroad Company. These goods were deposited upon a certain portion of defendant's premises, from which, according to the course of business between the two carriers, the connecting carrier would take them without further notice or request. So far as appeared, the connecting carrier, knowing that the goods so placed were for transit over its road, looked only to the marks on such goods for further shipping directions. The connecting carrier failed to remove the goods in question, and they were destroyed by fire. The court ruled that defendant was still the bailee for carriage, and so answerable to the owner for the loss. In this case there was no lack of shipping directions, and on the course of dealing between the two carriers the defendant would not again have handled the goods. But they were still on defendant's premises. The custody or possession in fact had not

passed to the connecting carrier. In Mt. Vernon Co. v. Alabama G. S. R. Co., 92 Ala. 296, 8 South. 687, the place of junction between the connecting carriers was Attalla. The car in question was laden with cotton brought to Attalla over defendant's road, and there placed by defendant's servants on a side track belonging to the connecting carrier, whence the latter was expected to move it on towards the place of ultimate destination. No notice of this was given to the connecting carrier, and the car while so placed was destroyed by fire. Defendant undertook unsuccessfully to prove that, by a course of dealing between itself and the connecting carrier, the latter was accustomed to receive on said side track, and haul over its rails to the Chattanooga Compress, cars laden with cotton, and there await the waybill, or ultimate shipping directions. The court was evidently of opinion that, if the car in question had been so taken and hauled to the Chattanooga Compress, it would have been delivered, but suggested that such a course of dealing would have been tantamount to a shipping direction to the connecting carrier to haul the car as far, at least, as the Chattanooga Compress. So in the case at bar the terminal association knew that each of the cars in controversy was to be hauled over its own rails, in any case, as far as to the place of loss. For that much of the transit over the rails of the terminal association no special shipping directions were needed; and whether that company received, before or after the haul to the place of loss, the waybill indicating the ultimate destination of the car, was, on its peculiar method of business, and course of dealing with appellant, an immaterial matter. From the ruling of this court that appellant must be held for the loss of the car numbered 1,004, consigned to Birmingham, I dissent. I concur in the conclusion that the decree against appellant as to the barley and the destroyed cars be reversed.

It is ordered by the court that the decree in case 454 be affirmed, and that the decrees in the other cases numbered 442, 452, and 453, in favor, respectively, of the Chicago, Milwaukee & St. Paul Railway Company, Jacob Rau, and the Huntting Elevator Company, be reversed, and the causes remanded, with direction in each case to dismiss the petition.