UNION TRUST CO. OF NEW YORK v. ATCHISON, T. & S. F. R. CO.

KEENAN et al. v. RECEIVER OF ATCHISON, T. & S. F. R. CO.

(Circuit Court, N. D. Illinois. November 26, 1894.)

CARRIERS—LIVE-STOCK SHIPMENTS—TERMINAL CHARGES—LOCATION OF DEPOT.
   A carrier's rates from one station to another must be a single charge, and where live stock is shipped to Chicago the carrier cannot make a terminal charge for delivery at the stock yards, which are off its line, where, by its universal practice, for many years, it has made the stock yards its depot for delivery of live stock.

Proceedings by Wilson T. Keenan and others against the receiver of the Atchison, Topeka & Santa Fé Railroad Company, appointed in the suit against that road by the Union Trust Company of New York, to determine the legality of terminal charges made by the receiver.

Green & Robbins, for petitioners.

E. A. Bancroft, for receiver.

GROSSCUP, District Judge. The petition of Wilson T. Keenan, and the subsequent petition of Dowd & Keefer and others, with the answers of the railroad company thereto, raise the question of the legality of certain so-called "terminal charges" demanded by the defendant. The petitioners are commission merchants at the Union Stock-Yards & Transit Company's yards, and have been engaged for many years in receiving consignments of cattle from the West and Southwest. The railroad company is a common carrier, engaged, among other things, in transporting live stock from Kansas City and other points to Chicago. In association with other railroad com-

panies, the defendant had, until June, 1894, been delivering to the stock yards, at a single freight rate, its live-stock cars. The stock yards are not on the line of its track, but are only reached over a line owned by the Union Stock-Yards & Transit Company. Until June last, no charge was imposed upon the railway by the stock-yards company for the use of its tracks, but since that date a charge of 40 cents a car, each way, has been demanded and collected. To meet these expenses, and the additional cost and labor of transporting the cars from its own line, over that of the stock-yards company, into the yard, the defendant road, along with the other railways centering in Chicago, in June last, issued a circular letter adding to the freight rate from Kansas City to Chicago (23½ cents a hundred) then in force an additional charge of $2 per car, as a terminal charge, and since that date the defendant road has been demanding and receiving this additional charge. The petitioners, Dowd & Keefer and others, challenge the legality of this charge, and ask the court to instruct the receiver to discontinue it for the future. The petition of Keenan shows the shipment from Kansas City, by his consignor, of four cars of live stock to the railway company's Chicago station, for which all the charges have been paid, except this terminal charge of $2 per car, and asks the court to instruct the receiver to deliver to the petitioner the cattle shipped in these cars, notwithstanding his refusal to pay this terminal charge. Both petitions, however, in the end, turn upon the legality or illegality of the so-called "terminal charge." The railway company has at Twelfth street yard, room enough to establish a delivery station, and some facilities in that direction; but it was not claimed upon the hearing that these yards had been for many years used for such purposes, or that they could be now used, until additions and modifications were made.

The specific question raised is this: Is the railway company, under its freight rate of 23½ cents per 100, required to transport the live stock delivered to it at Kansas City to the stock yards without further charge? The question is not one of contract between the petitioner and the railway company, but is a question of right between it and the public. The defendant is a common carrier, and the petitioners are entitled to the same rate that the public can demand. Their particular contract or special knowledge, therefore, is inconsequential, for common carriers are required to serve all alike, and may not exact—even by contract—from one what it cannot rightfully impose upon all. It is a servant of the public, entitled to charge for its services what the law permits, but not allowed to discriminate between shippers; and that, too, irrespective of whether such discrimination is the result of oppression and duress, or of voluntary contract. Stability of business conditions and fairness in business competition require that each man's expenses at the hands of the carrier shall be the same as those accorded to all others,—no more and no less,—and the law will not permit that such equality should ever be disregarded by the carrier, or voluntarily waived by the shipper. What charge, then, can the defendant company lawfully impose upon the general public for the transportation of live stock from Kansas City to the stock yards in Chicago?

The duty of the carrier is to furnish facilities for loading, carrying, and unloading. Its custody of the stock remains, and its obligation is not discharged until the shipper is furnished with proper facilities to unload. The carriage includes the delivery, and there can be no delivery, except at such a place as is suitable to the delivery of the particular thing carried. A delivery of live stock in the company's passenger station or freight platforms, unattended with suitable chutes, yards, etc., would be no delivery at all. It is the duty of the carrier, therefore, as said in the Covington Stock Yards Case, 139 U. S. 128, 11 Sup. Ct. 461, to furnish these facilities to the shipper.

The freight demanded covers the entire service of the carrier from depot to depot. It is in law the compensation, not only for the actual carriage, but also for the facilities furnished for loading and unloading. The service is a single one, and the compensation is likewise single. The law will not permit the charge for such single service to be divided. A carrier cannot make up its bill of charges in items,—one for loading, one for carriage, one for personal service of attendants, one for delivery, etc. The freight is not an aggregate of separate charges, but a single charge. This policy of the law is not because a particular shipper might not deal with the carrier as intelligently in the case of one method as in the other, but because the public is not so likely to deal intelligently with a series of items as with a single freight rate. The shipper may be intelligent or unintelligent, ignorant or educated, accustomed to business, or inexperienced in such affairs, deliberate and careful, or hasty and uninquiring. The service of the carrier is for one as well as the other. A single charge presents to him at once the whole problem. A series of charges might confuse him, and leave uncertain what, in the end, the aggregate would be. For illustration, many roads centering in Chicago reach their passenger stations over other lines. Would it be tolerable to permit them to sell tickets from New York or Louisville to Chicago at a single rate, and then impose a further terminal charge at this end of the line? Would such practice be made less intolerable by the fact that the company actually carried the passenger on its own line within the corporate limits, thus fulfilling the letter of the contract, or by the fact that the additional terminal charge was posted, along with other rates, in the station of departure? The practical objection is that the public generally knows or ascertains the locality of the company's station within the city of destination, but in few instances consults the posted passenger rates. If the public did consult the posted rates, it would only be confused by any method other than that of a single rate, for travelers do not usually carry pencils and tabs, and the majority would be unable to figure out satisfactorily the results of tabulated statements. The law comes to their rescue by requiring the carrier to name, under a single and definite item, the cost of its entire undertaking, from station to station. It may be admitted that the reasons for a single charge in the case of freight traffic are not so cogent as in that of the carriage of passengers, but they are of the same character, and are calculated to safeguard the public against miscalculations and mistakes. Any other rule would expose those who are entitled to

the service of the carrier to hardships and injustice that can easily be avoided, and open up opportunities to dishonest or tricky carriers that should not be tolerated.

The duty of the defendant company, in this case, therefore, is to carry the live stock offered to it at Kansas City to its station of delivery in Chicago at a single charge, without the imposition of other charges, under any name or pretext. This does not exclude additional charges for services beyond the defendant's undertaking, or change the obligation of defendant with respect to goods or stock accepted for delivery at its Chicago station, when delivery is made, or offered to be made, at that station. It sometimes happens that a further service is required. The shipper may not wish his goods delivered at the station, but at some other point in the city, reached, perhaps, over another railroad's tracks, or by some other method of transportation. A terminal charge for this service is proper, both because it is not included in the carrier's undertaking, as held out to the public generally, and because such additional service to a special shipper, without charge, would be unfair to his competitors. In such cases the law permits, and the interstate commerce act expressly recognizes, the right of a terminal charge. The only limitations are that the additional charge be reasonable, and that the amount be announced in advance, so that the particular shipper wishing the additional service may be advised of the amount of his increased obligation.

The inquiry then resolves itself to this: Do the chutes and sheds at the stock yards constitute the defendant's Chicago station for the delivery of live stock, or are they at a point beyond or different from the station? If the former, a terminal charge cannot be imposed; if the latter, it may. The fact that the defendant may have some place on its line of road in Chicago where stock could be delivered is not absolutely controlling. The construction and the maintenance of yards unused would not necessarily establish the locality of the station. The question is practical, not technical, and is to be solved, not so much by what the carrier might pretend to do, as by what it actually does. The attention of the public is arrested by actualities, and its understanding of the carrier's undertaking is derived from what the carrier commonly does. To circumvent that understanding by a pretense of maintaining yards where they are not used might be worse than boldly disregarding the law itself, for the rule of law requiring a single charge from the point of acceptance to the point of delivery has no reason for existence, save that the reasonable understanding of the public may not be disappointed. Neither is it a sufficient answer that the practice of the company in this case does not differ from that of carriers where terminal charges are allowed, except that in respect of live stock the deliveries of this company to a point off its line are universal, while in the cases where terminal charges are allowed such deliveries are only special and occasional. The universality of delivery at a certain place, or something approaching that, may be the very thing that constitutes that place the company's depot. If the practice of the carrier is of such a character that the public is reasonably led to understand a certain place to be the com-

pany's depot, the carrier should be held to that understanding. Terminal charges are allowed in particular cases where the delivery is to be somewhere else than at the carrier's depot, but that does not allow the carrier to establish its depot at some place off the line, and then add terminal charges. Where, then, in contemplation of law, is the defendant's station for the delivery of live stock in Chicago? The petitions and the answer, and the admissions at the hearing, leave me in little doubt that it is, and has been for a long time, at the stock yards. At no other place have car loads of stock, so far as I am advised, been delivered or unloaded for years. At no other place in Chicago could the company accomplish the delivery of the live stock that comes over its line, except by extensive creation of facilities. There has been nothing in the carrier's practice upon which the shippers at Kansas City could form a belief that the cars would go anywhere else in Chicago than to the stock yards. Lay aside, for illustration, any consideration of rate, and view this case as if it turned upon the right of the shipper to have his live stock delivered at the stock yards, and nowhere else. What would be his right in that respect, on the facts disclosed? He certainly had a right to a delivery at some particular place in the city. Chicago covers a large area, and it cannot be within the power of the carrier to discharge the cargo anywhere within the city limits. The right of delivery at a fixed depot—the depot in contemplation at the time of shipment—is as much a right, under the conditions that prevail in this city, as the right of delivery within the city limits at all. An unloading at Twelfth street might be as great an injustice, in view of the shipper's reasonable understanding, as an unloading 25 miles in the country. At what depot, then, can he insist upon a delivery? Certainly, in my judgment, at that place the carrier has held out as the depot. Now, why is that true? Not because the carrier has expressly so agreed. Its contract makes no mention of any place except the Chicago station. It is simply because the law, by implication, makes that a term of the understanding, which the conduct of the parties reasonably imports into it. If such practice makes the stock yards the depot of the company, for the purpose of fixing the right of the parties in respect of the locality of delivery, is there any reason why defendant may not likewise make it the depot for the purpose of ascertaining the legality of the rates? If it is the actual depot, in view of which all shipments are made, it is also the local depot, in view of which all rates must be adjusted. To say that, contrary to the prevailing practice, the company could deliver anywhere it pleased, except upon special arrangement, would be to deny the plainest implication of the law. To admit that the delivery, except in specially understood cases, must be at some fixed place, but deny that such place was the depot of the company for such, would amount to saying that the company's obligation was to deliver at some place other than its depot. I am impressed with the belief that the practice of the defendant has made the stock yards its depot for the delivery of live stock. The fact may, on further proof and consideration, be seen to be otherwise, but I am convinced I should enter an order in consonance with present impressions. The court cannot suffer its receiver

to impose doubtful charges.    An order will accordingly be entered requiring the receiver to deliver to Keenan the four cars of stock in question without the payment of further charges, and also instructing the receiver, until the further order of this court, to discontinue the levying of the additional terminal charge upon live stock between Kansas City and Chicago.    Nothing in this order, of course, will prevent the defendant company from changing its freight rates between these two points, or from establishing, in good faith, any depot in Chicago, other than at the stock yards, for the delivery of live stock, provided such a change would be good business policy.