WALKER et al. v. KEENAN et al.

(Circuit Court of Appeals, Seventh Circuit. May 4, 1896.)

CARRIERS—SHIPMENTS OF CATTLE—TERMINAL CHARGES.

    A railroad company accustomed to deliver cars of cattle at stock yards off its line, by transporting them over a line belonging to the stock yards company, for which it pays a fixed sum per car, is under no obligation

to consignees whose business is located at the stock yards to supply unloading facilities at its own station in a different part of the city, and hence is not bound, in default thereof, to deliver at the stock yards, without a separate charge. On the contrary, it may, on posting schedules to that effect, as required by the interstate commerce law, make a charge for freight to the city, and a separate terminal charge, of a fixed sum per car, for delivery at the stock yards. 64 Fed. 992, reversed. ·Stock-Yards Co. v. Keith, 11 Sup. Ct. 461, 139 U. S. 128, distinguished.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

On the showing of the record, the Atchison, Topeka & Santa Fé Railroad, commencing, it may be assumed, at some point west or southwest of the state of Missouri, passes through Kansas City, in that state, to its terminal station or freight depot on or near the corner of Twelfth and State streets, Chicago. About 10 miles back from this terminal station, a switch track runs from the main line of the road some 6 miles to a point of junction with the track of the Union Stock-Yards & Transit Company. This latter track extends from said point of junction to the cattle yards of the last-named company, the place at which cattle are usually unloaded from the cars into such yards being about one-half mile from the point of junction. This track of access to the cattle yards is part of a system of railroad tracks aggregating some 246 miles, which the Union Stock-Yards & Transit Company (incorporated) was authorized by its charter to construct in and about its cattle yards, and connecting therewith, and to charge for the use of. Said yards, commonly called the "Union Stock Yards," are the market place and ordinary place of delivery for cattle shipped by the car load to Chicago. A car laden with cattle sent from Kansas City to Chicago will ordinarily be moved by the route described from the main line of the Atchison, Topeka & Santa Fé Railroad to the Union Stock Yards, and there unloaded and delivered, rather than to the terminal station of the road, at State and Twelfth streets; and, for this reason, cattle yards and appliances for unloading such cars have not been provided at such terminal station. Cattle cars aggregating many thousand per year, hauled to Chicago over said road, are so taken to, and unloaded at, the Union Stock Yards. In December, 1893, as stated in the printed argument for appellants, the Union Trust Company of New York commenced a suit in the circuit court of the United States for the Northern district of Illinois to foreclose upon a mortgage upon the railroad property of the Atchison, Topeka & Santa Fé Railroad Company and for the appointment of receivers to take possession of the property, collect the tolls, and operate the railroad pending the litigation. These appellants were appointed receivers. The suit is still pending. They are in possession of said railroad, and its traffic as a common carrier is now conducted by them. On November 2, 1894, appellee Keenan filed in the cause his intervening petition, making the receivers parties defendant thereto. He commences his petition with the statement: "That he resides in and is a citizen of the city of Chicago, state of Illinois, and is, and has been for about twenty-nine years, engaged in the business of receiving for sale on commission, buying, selling, and shipping live stock at the Union Stock Yards, heretofore adjoining, and now within, the corporate limits of said city." He goes on to say that on the 30th and 31st days of October, 1894, four car loads of cattle were shipped to him from Kansas City, over the Atchison, Topeka & Santa Fé Railroad; that the cars containing his cattle were hauled over the road to Chicago, and there taken to the Union Stock Yards, and unloaded; that he has paid the freight from Kansas City to Chicago, but the receivers refuse to allow the cattle to pass into his custody without an additional payment of eight dollars, or two dollars for each of the four cars. He shows, also, that the waybill for two of the cars, which document was subscribed by the shippers and by an agent of appellants, contains the specification, "To be delivered at Chicago station at rate of trff;" that on the other two cars the shipper did not advance the freight, and as to them no written contract was subscribed by himself, or any person on his behalf; and that appellants have provided no means for unloading and

delivering cattle at their said "Chicago station." Upon the theory that the two dollars per car is a charge made by appellants for moving such cars from the main line of their road to the Union Stock Yards, and for there unloading the same, and for the use of the inclosures and appliances there provided in that behalf, and upon the theory that appellants are bound by law to provide at their said Chicago station, or at some point on their line in Chicago, "platforms, chutes, yards, stations, and cattle pens," suitable and appropriate for the unloading and delivery of cattle, Keenan insists that the delivery station at the Union Stock Yards must be deemed their Chicago station; wherefore he asked the court to order that his cattle be turned over to him without payment of the eight dollars, and that appellants be required to provide such appliances for the delivery of cattle at some point on their road in Chicago, or, in default thereof, that they in future transfer to, and unload and deliver at, said Union Stock Yards, without any charge for so doing, all cattle consigned to him. At the time of the filing of Keenan's intervening petition, other persons, firms, and corporations, to the number of 36, all cattle dealers doing business at the Union Stock Yards, joined in a similar intervening petition, but without specification of particular shipments of cattle. They also, and on the theory advanced in the petition of Keenan, asked that appellants be ordered, in default of appropriate delivery appliances on their line of road in Chicago, to move cars containing cattle consigned to any one of the several petitioners, to the Union Stock Yards, and there unload and deliver the same, without extra charge for so doing. Appellants answered each petition, and, from such answers and a stipulation made by the parties, the facts appear substantially as herein above given.

Section 6 of the interstate commerce law, enacted February 4, 1887, as amended March 2, 1889, contains the following provisions:

"Sec. 6. That every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property which any such common carrier has established and which are in force at the time upon its route.

"The schedules printed as aforesaid by any such common carrier shall plainly state the places upon its railroad between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately the terminal charges and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates and fares and charges.

"Such schedules shall be plainly printed in large type, and copies for the use of the public shall be posted in two public and conspicuous places, in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation in such form that they shall be accessible to the public and can be conveniently inspected."

In the month of June, 1894, appellants duly published and posted, in connection with their schedule of rates (which up to that time showed 23½ cents per hundredweight to be the freight charge on cattle from Kansas City to Chicago), the following: "On and after July 9, 1894, a terminal charge of $2.00 per car will be made in addition to the Chicago rates, as shown in the tariffs of the Western Freight Association, on live stock and other freight received from or delivered to the stock yards or industries located on the tracks of the Union Stock-Yards Railway, the Indiana State Line Railway; and $3.00 per car on shipments received from or delivered to the Northern Indiana Railroad at Hammond." Pursuant to this announcement (and no question seems to be made of any default in complying with the statute, or any want of knowledge of the foregoing announcement on the part of any petitioner), appellants exacted the two dollar charge in question. It may be here added that prior to June 1, 1894, the Union Stock-Yards & Transit Company permitted appellants and other carriers of cattle by rail to move cars over its tracks to the Union Stock Yards, and there unload into its yards and return, without charge. On the day last named, said Union Stock-Yards & Transit Company commenced, and thereafter continued, to make a charge against such carriers of from 80 cents to $1.50 per car.

Robert Dunlap, for appellants.

A. W. Green and H. S. Robbins, for appellees.

Before WOODS, JENKINS, and SHOWALTER, Circuit Judges.

SHOWALTER, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

In the recital in Keenan's waybill, "To be delivered at Chicago station at rate of tariff," which is otherwise in print, the word "Chicago" was evidently written on a space left blank by the printer. This was done at Kansas City. It is obvious from the showing of the record that cattle consigned to Keenan were not, within his understanding, to be unloaded and delivered at any station in Chicago on appellants' line of road. The cattle were to be taken to the Union Stock Yards, where Keenan did business. The case of the two cars mentioned in said waybill is nowise different, as affecting the matter in controversy, to what it would be if no such paper had been subscribed.

In Covington Stock-Yards Co. v. Keith, 139 U. S. 128, 11 Sup. Ct. 461, a bill had been filed by Bliss and Gates against the Kentucky Central Railroad Company, to foreclose a mortgage on the railroad property of the defendant. Receivers had been appointed, and, at the time of the controversy, the suit was pending, and the receivers were in possession of and operating the defendant's road. On the 18th of June, 1886, Keith filed in the cause his intervening petition, making the receivers the parties defendant. Prior to the commencement of the foreclosure suit, and on November 19, 1881, the defendant railroad company had contracted with the Covington Stock-Yards Company, whose cattle yards adjoined the railroad track, and were, or were to be, provided with appropriate platforms, chutes, feeding pens, and inclosures, for the loading and unloading and delivery of cattle. By this contract, said yards became the railroad company's "depot for delivery of all its live stock," and it was not to build or "allow to be built on its right of way any other depot or yards for the reception of live stock." The Covington Stock-Yards Company was to perform for the railroad company the service of loading and unloading cattle, and to collect therefor a charge from all shippers and consignees not to exceed 60 cents per car load, and account to the railroad company for the same. Said stock-yards company was also to feed and care for all cattle brought to the yards pending transfer to the cars or delivery to consignees. For this a reasonable charge was to be collected, and turned over to the railroad company; and, for all these instrumentalities and services, the latter company was to pay the former a certain compensation. Keith was the owner of appropriately constructed cattle yards, separated by the width of a street from the yards of the Covington Stock-Yards Company, and adjoining a switch track of the railroad company. He had constructed or provided, apparently by the license of the railroad company, express or implied, platforms, chutes, and inclosures connecting his yards with said track. For a time subsequent to March 1, 1886, all cattle consigned to Keith, or his firm

Keith & Wilson, who were dealers in cattle on commission, were unloaded into Keith's cattle yards; but prior to the 18th of June, 1886, the receivers caused Keith's appliances for loading and unloading to be removed from their track. Keith was thereafter compelled to accept delivery of cattle consigned to his firm through the yards of the Covington Stock-Yards Company, and was thus obliged to pay 60 cents per car for a service which, without inconvenience either to the public or the railroad company, he was prepared to dispense with; hence his intervening petition. The court ordered the receivers, in the event that they or their agent in that behalf, the Covington Stock-Yards Company, should choose not to permit Keith thereafter to take his cattle through their yards without the 60 cents charge, to allow him to replace his platforms and chutes, and to unload and deliver to him thereat (he, or some agent employed by him, being then present to take charge of such cattle) all cattle consigned to him or to his yards. This ruling was affirmed by the supreme court of the United States.

As incidental to its business of transporting or hauling cattle, a railroad company must provide the means of loading, unloading, and caring for such freight pending its delivery to the consignee. The hauling the cattle from one point to another, and the providing the car, track, engine, and servants for that purpose, are no more a part of the service rendered by the carrier than are the loading and unloading and the providing the appliances and servants for those purposes. Nor, in the nature of things, is there any reason why, if the public convenience be subserved thereby, the compensation may not be apportioned so that so much may be paid for the loading and the hauling, and so much for the unloading and the care of the animals pending delivery. It was not necessarily a hardship or wrong, as against the ordinary consignee at Covington, that he pay the charge of 60 cents per car for unloading, etc., to the agent in charge of the stock yards there. Such charge ought, of course, to be specified, as now provided by the interstate commerce law, in connection with the tariff schedule, in order that the shipper may be advised of the same. The question whether a person to whom cattle were consigned for delivery at the Covington Stock Yards could have resisted the charge of 60 cents per car was not before the court in the Keith Case; nor could the court have ruled in the affirmative on such question, assuming due notice to the shipper beforehand, without, in effect, compelling the railroad company to perform, for nothing, part of the service comprehended in its obligations as a carrier. Keith's Case stood on its own facts. Keith having, without inconvenience, so far as appears, to the public or to the railroad company, and apparently by its permission or the permission of the receivers, himself provided the facilities and appliances for unloading into his yards cattle consigned to his firm, the railroad company or the receivers representing it, on the one hand, no longer owed to him, as respected cattle consigned to his yards, the duty of providing such structures and appliances; nor, on the other, was Keith bound to pay the railroad company or its agent in that behalf, the Covington Stock-Yards Company, any charge

which, on the face of the case, was distinctly a compensation for the performance of such duty. The Case of Keith, furthermore, shows the expediency and propriety of separating and apportioning the compensation to the carrier, so that the instrumentalities for and the service of unloading need not be paid for when the consignee has no occasion to use said instrumentalities or to exact such service. That decision, on its ultimate and essential facts, is that a railroad company, when the means for the unloading and delivery of cattle have been provided by the consignee himself at a convenient point on its line of road, may not refuse to make such delivery for the sole and only purpose of compelling such consignee to pay a charge fixed by the company in response to its obligation to provide the means of unloading for consignees who must, necessarily, require that service. If Keith's yards had been at some point in Covington, remote from the Kentucky Central track, and he had, by the license of the Kentucky Central Railroad Company or the receivers, extended a track of his own from the Kentucky Central track to his yards, and had there equipped a station for unloading, there would have been no obligation on the railroad company to Keith or his patrons to provide a depot on its line for the unloading of cattle consigned to his yards; nor could Keith have referred to such supposititious obligation as a reason for resisting compensation to the railroad company for the service of moving cattle cars from its line over his track to his yards.

In the case at bar, appellants, with their own engines and switching crew, remove the cars laden with cattle from a point on the Chicago end of their line, over the track of the Union Stock-Yards & Transit Company, to the Union Stock Yards. For this transfer from their own line to the stock yards, they charge, as stated on the tariff schedule, $2 per car. All the petitioners do business at the Union Stock Yards. It is the understanding between them and appellants that cattle cars consigned to them are to be taken to the Union Stock Yards, and there unloaded. Upon the general and ordinary obligation of a common carrier of such freight to provide the appliances for unloading, and upon the fact that appellants have not provided means for unloading and delivering cattle at their freight depot in Chicago, petitioners argue: First, that the $2 per car is for depot facilities at the stock yards; and, second, that the stock-yards station must be held to be appellants' "Chicago station," in the same sense as would be the terminal station at Twelfth and State streets if cattle yards and facilities for unloading were there provided. But the obligation of appellants to furnish delivery facilities upon their line of road in Chicago is not due to these petitioners with respect to cattle which appellants are expected to bring to the Union Stock Yards. Petitioners do not desire their cattle unloaded and delivered at any point in Chicago on appellants' line of road. The $2 per car is not a charge for the use of the inclosures and station fittings at the stock yards, but for moving the cars from the line of appellants' road, and over the line of another company (which company exacts from appellants a toll of 80 cents per car), to a point in Chicago on said last-named line.

The case is the same as though petitioners themselves owned the stock yards, and the delivery station there, and the tracks leading to said station, and appellants charged them $1.20 for transferring a car from appellants' line in Chicago to said stock-yards station. If facilities for unloading cattle cars were provided by appellants at their station in Chicago (the showing of the record being otherwise, as it is), the fact would be immaterial, since the petitioners' cattle must be taken by appellants to the Union Stock Yards. Appellants' failure to supply unloading facilities at its Chicago terminal station can in no way affect the rights of a litigant who, in view of the question at issue, could in no event have benefited by such facilities.

The learned counsel for appellees treat the Covington Case as a pronouncement by the supreme court that the receivers there must forego their 60 cents per car, and let Keith's cattle be delivered through the Covington Stock Yards, unconditionally. On the contrary, the essential and central fact upon which the judgment went was, as already explained, that Keith's yards adjoined the track, and he had, without hurt to the railroad company or to the public, and apparently by the license of the company, provided the means of unloading into his own yards. He had no occasion to avail himself of the service of, and the instrumentalities provided by, the Covington Stock-Yards Company, the concern which had assumed, to that extent, the duty of the carrier; hence the order that his cattle must either be unloaded into his own yards, or else passed free of charge through the yards controlled by the Covington Stock-Yards Company for the railroad. If the rule of law had been as counsel for these appellees contend, then the order would have been that Keith's cattle be unloaded free of charge into the yards used by the railroad company, without any alternative. The alternative implies that except in the case of Keith, or of a person having cattle yards and unloading facilities in Covington similarly situated with respect to the road operated by the receivers, the yards provided by the railroad company or the receivers as a place of delivery must be used, and the 60 cents paid as a proper item in the freight charge. To any assumed rule of law that a carrier could not divide into two or more items his freight charge for carrying live stock, so that the instrumentalities for unloading and delivery need not be paid for by consignees who are themselves prepared to receive their cattle directly from the cars, the decision in the Covington Case cannot be referred. The opinion states no such rule; nor can any such rule be evolved therefrom consistently with the judgment of the court.

When, as here, the delivery is to be made in Chicago, but at a point away from the carrier's line, and by means of a track not owned or possessed by the carrier, the printed schedule of such carrier showing in two items the compensation exacted for the haul to Chicago, and that exacted for the transfer in Chicago to the point of delivery, the theory that such carrier is bound by law to unload such freight at a station on its own line in Chicago, and that the transfer from its line to a point on the other line for the purpose of delivering at the latter point (being an equivalent or substitute for what ought to have been done pursuant to such supposed obligation)

is comprehended in the service of hauling to some station on its line in Chicago, is unsound. One side of the proposed equation is mythical. There is no obligation on the carrier in such a case, and as to such a consignment, to unload at a station on its line in Chicago, or to provide unloading and delivery facilities at such station. In the carrier's charge for the haul to any station or point on its line in Chicago, in such a case, there is not comprehended any compensation for unloading facilities at such station or point. The 23½ cents per hundredweight pays these appellants for hauling from Kansas City to a station or point on their line in Chicago; the $2 per car pays for the transfer thence to the stock yards, where the consignees desire the delivery to be made.

The Covington Case was prior to the interstate commerce law. Within the express terms of the second paragraph of section 6, quoted in the statement which precedes this opinion, the total compensation to the carrier for his services as carrier may be divided into at least two items. The separation by these appellants of their charge for loading and hauling to Chicago from their charge for transferring from their line in Chicago to a specified point in Chicago, away from their line, is authorized by the statute. No satisfactory reason suggests itself against the legality and propriety. under special circumstances, such as exist here and as existed in the Covington Case, of such a division of his compensation by a carrier even apart from the statute. The learned district judge who made the order appealed from evidently understood the opinion in the Covington Case to imply that no division of a carrier's charge could be made. If this were the sound construction of that case, the statute has changed the rule, as already suggested.

It is not suggested, assuming any such charge as is here in question to be legal at all, that the amount is unreasonable. The contention that the carriers must move cattle from their lines of road over the track of the stock-yards company to the stock yards, without compensation other than as contained in their charges for hauling to points on their respective lines in Chicago (and this is what the claim of these appellees amounts to), is invalid.

The order appealed from is reversed, and the cause remanded, with the direction that said order be vacated, and the intervening petitions dismissed, for want of equity.