INTERSTATE COMMERCE COMMISSION v. CHICAGO, B. & Q. R. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. June 15, 1900.)

No. 665.

CARRIERS—REASONABLENESS OF RATES—TERMINAL CHARGES.

A separate and fixed terminal charge of two dollars per car on live stock consigned to or from Chicago, made by the railroads entering that city, in addition to the charge for transportation over their own lines, to cover the cost of transferring such cars from their lines to the Union Stock Yards, which constitute the live-stock market of the city, over the tracks owned by the stock-yards company, and which is shown to be approximately the average cost of such service, when adopted and published as a part of their rates in accordance with the requirements of the interstate commerce law, does not render such rates unreasonable and unjust, although the roads themselves furnish no terminal facilities at

Chicago for handling stock, and the Union Stock Yards were originally established, and have ever since been used, as the general depot for live stock by all the roads.

Grosscup, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

S. H. Cowan and W. A. Day, for appellant.

L. W. Bowers, for appellees.

Before BROWN, Circuit Justice, and WOODS and GROSSCUP, Circuit Judges.

BROWN, Circuit Justice, delivered orally the opinion of the court.

We have come to the conclusion that this case must be affirmed upon the authority of Walker v. Keenan, 19 C. C. A. 668, 73 Fed. 755.

While the facts of the two cases differ in some immaterial particulars, the principles involved are practically the same, and a proper deference to the prior decisions of this court requires a similar conclusion.

As this is the first case involving the validity of the terminal charges which has been called to my attention, I have thought it proper to state briefly my reasons for concurring in the conclusion of the court in the prior case.

I have no doubt it is the general duty of railway companies to provide proper facilities for the reception and discharge of freight and passengers at each of their regular stations upon the line of the road. The location of such stations must be determined largely, if not exclusively, by the railway companies themselves. Having regard for their own interests, they would naturally provide such facilities as near the center of the town as they are able, consistently with the price of real estate, the convenience of their customers, and their connection with other railways.

The character of these terminal facilities must be determined by the custom of the place and by the demands of the traffic. So far as passengers are concerned, they usually consist of a platform, a building for the reception of passengers, and a baggage room for the accommodation of luggage. Upon this platform passengers alight, and from that moment the responsibility of the company as a carrier ceases. They separate to different parts of the city, taking their own conveyances; and their luggage is deposited in the baggage room, remaining subject to their call for a reasonable time.

So far as what is known as "dead freight" is concerned, a freight depot is usually provided, in which the freight is deposited, and notice given the consignee, or, under the custom of some places, the property is delivered personally to the consignee, for which an extra charge is made.

But suppose there be an exceptional kind of traffic, such as live cattle. I should have no doubt that, if the transportation of such cattle became a substantial part of the traffic of the road, terminal facilities should be provided for them; and, if it were the custom of the place for the consignee of cattle to call and drive them away, pens should be

built for their immediate confinement until the consignee can be apprised of their arrival, and a sufficient time has elapsed for him to remove them.   Until 1865 that seems to have been the custom in Chicago, where there were four or five cattle yards near the principal railway stations.   The record does not show whether the consignee came there and drove them away, or whether they were marketed and slaughtered there; but this is immaterial, so far as the duties of the railway company were concerned.   So it is usual, in the stock-raising portions of the country, to provide cattle pens for the detention of cattle until they are laden on board the cars, and sometimes for their delivery by the railway company in those yards.

While I do not think railway companies would be bound to furnish terminal facilities of this kind for an occasional horse, or perhaps even for an occasional and wholly exceptional car load of live stock, yet, if cattle became a substantial part of the traffic, I have no doubt provision should be made for their reception.

In 1865 the Union Stock Yards were organized, a large area of lands purchased, and separate tracks laid by the stock-yards company, connecting with practically all the railways running to Chicago.   From this time the demand for separate terminal facilities at each of these railways seems to have ceased, and all cattle were consigned for delivery at the stock yards,—not for the purpose of being claimed there by the consignee, but for the purpose of finding a market for them. Here all the cattle consigned to Chicago are deposited for slaughter or for further shipment, and great slaughtering houses have been erected in the vicinity of the yards for the disposition of the cattle. Providing a market for cattle is certainly no part of the business of the railway company; and I think, therefore, any extra expense occasioned from the time the cars containing the cattle leave the tracks of the company, and until they arrive at the stock yards and the empty cars are returned, the company is entitled to make an additional terminal charge, equivalent to the expense occasioned to it by providing these extra facilities.

Prior to June 1, 1894, the railway companies seem to have assumed this burden themselves, but at this time a trackage was imposed by the stock yards of from 40 to 75 cents each way upon every car going and returning from the tracks of the railway company to the stock yards.   It is insisted that, as this is the only extra expense then occasioned, any charge beyond that was unreasonable and improper.   I do not think that necessarily follows.   While the imposition of this trackage charge by the Union Stock Yards was doubtless the immediate occasion for a reformation of its tariff, the railway companies were then at liberty to adopt a new schedule with relation to these terminal facilities, and charge what they actually cost them.

The evidence is that it costs some railways a trifle less than two dollars, and some considerably more than that.   The average seems to have been somewhat more than two dollars. , But we think it was proper for the railway companies, whether the expense to the companies were a few cents more or less, to adopt this amount as an approximate charge, and that their action in so doing should be sustained.

In the limited time at my disposal, I find myself unable to file a written opinion; and, as the case will doubtless be appealed to the court of last resort, it seems quite unnecessary to do so.

The decree of the circuit court is therefore affirmed.

GROSSCUP, Circuit Judge (dissenting). Prior to 1865 the railways entering Chicago had four separate places for the delivery of live stock, each equipped with the necessary facilities. Considering, for obvious reasons, a union of these facilities desirable, the Union Stock Yards were established by the railways, though as a separate corporation, with such lines of intervening railway as put the yards in connection with all the roads centering in Chicago. It is substantially undisputed that, from the consolidation of these delivery stations until 1894, the chutes, pens, and other equipment at the new stock yards, were the delivery station for live stock of each of the defendant railways; that, although owned by a separate company, no extra compensation was charged for the use of the intervening tracks, or the unloading facilities; that the other live stock stations were abandoned; that no separate stations, except perhaps in mere semblance, have since been established; and that, by this long course of dealing, the shipping public has come to look upon the Union Stock Yards as the destination of cattle shipped to Chicago.

In June, 1894, the Union Stock Yards having passed largely from the ownership of the railways to outside parties, a minimum trackage charge of forty cents per car was imposed upon the railways by the Stock Yards Company. Thereupon the railway companies inserted in the schedules, required by the Interstate Commerce Act, a paragraph to the effect that upon all live stock, or other freight received from, or delivered to, the stock yards, a terminal charge of two dollars per car would be thereafter made, in addition to the flat Chicago rates. It is the lawfulness and reasonableness of this charge that is the subject-matter of this case.

The precise question, so far as it relates to the lawfulness of the charge, has been before the courts of this circuit three times. In the first case, in the circuit court, Union Trust Co. v. Atchison, T. & S. F. Ry. Co., 64 Fed. 992, it was held that, as a matter of public policy, a charge for freight must be held to cover the entire service of the carrier from depot to depot inclusive; that such service and charge include, not only actual carriage, but also the necessary facilities for loading and unloading; that the service being a single one, the compensation is likewise single, and in law incapable of division; that the carrier can not make up its bill of charges in items,—one for loading, one for carriage, one for personal service of attendants, one for delivery, etc. The ruling in that case was supposed to be founded upon the Covington Stock Yards Case, 139 U. S. 128, 11 Sup. Ct. 461, 30 L. Ed. 914.

The case was reviewed in the circuit court of appeals under the title of Walker v. Keenan, 19 C. C. A. 668, 73 Fed. 755, where it was in effect held that, although, as incidental to its business of transporting cattle, a railway company must provide the means for loading and unloading, there is no reason in law, or in the nature of things,

why the compensation may not be apportioned; that it is lawful, other considerations aside, that a charge may be made for the loading, another and separate charge for the carriage, and still another for the unloading and delivery. The compensation to be received was not looked upon, in this decision, as a single charge; but rather as an aggregation of such separate charges as, being reasonable in themselves, may have been properly inserted in the published schedules.

In the present decision the majority of the court hold it to be the general duty of the railway companies to provide proper facilities for the reception and discharge of freight and passengers at each of their regular stations; and, inferentially, as I read the opinion, that no extra charge may be made for these unloading facilities. But live stock is regarded as an exceptional kind of traffic, and its transportation to, and delivery at the stock yards, as something superadded to the general undertaking of the railway companies to transport live stock from the stations of initiation to Chicago. This opinion seems to me to shift the ground upon which Walker v. Keenan, supra, was decided, and while sustaining the general proposition upon which Union Trust Co. v. Atchison, T. & S. F. Ry. Co. was decided, to hold that delivery of live stock at the stock yards is an exception to the requirements of the general rule. In view of these rulings, and especially of the change of ground taken by the majority opinion, I look upon the question involved as a more or less open one, and have thought it not improper to restate, in substance, the grounds upon which, in the circuit court, I decided the case of Union Trust Co. v. Atchison, T. & S. F. Ry. Co., and upon the basis of which I am constrained to dissent from the decision in this case.

As common carriers of freight and passengers, railway companies come in touch with every character of shipper and traveler. They deal alike with the unintelligent and the intelligent; with people inexperienced in matters of traffic, as well as with the experienced; with people in haste and uninquiring, as well as with people deliberate and careful.

The usual passenger buys his ticket at the station where he goes aboard, expecting that it will carry him to the general passenger station in the city of destination. He does not consult the rate sheet, and, least of all, does he inquire if the line over which he travels may or may not include rails and stations belonging to another company. The usual shipper is remote from the station of destination. He is unacquainted with local conditions, especially if that station be a great city spreading over a large territory. He has in mind a single place of delivery; and when he inquires respecting the rate of freight, unquestionably conceives that the payment of the sum named will lay down his goods in the general depot of delivery. However much, as a careful man, he ought, perhaps, to consult the posted rates, he does not, as a matter of fact, consult them. Both traveller and shipper, with perhaps a few exceptions, accept without further inquiry the railway agent's general statement respecting the company's charge, and act upon the presumption that the charge is from depot to depot inclusive.

Now what, upon such a state of facts, irrespective of a divisional posted rate, would be the measure of the carrier's undertaking? Could it rightly compel the passenger to alight at a suburban station, geographically within Chicago, and, therefore, in letter, within the terms of its obligation? Could it deposit the freight at some depot other than its general depot, though such other depot was within the city limits? No one, I think, will so contend. The tangible, visible facts relating to the usual places of depositing passengers and freight constitute an element, though unexpressed, in the carrier's undertaking; and its contract will be construed as if such element had been plainly embodied in the ticket, or bill of lading. Any other interpretation would violate a primary rule in arriving at the terms of consent between parties.

The posting of a divisional rate—one item for carriage and another for delivery facilities—may be regarded technically as a purposed exclusion of this unexpressed element; but in practice the traveller and shipper would proceed upon the same conception as if there had been no posting and the rate had remained single. They would still be guided, notwithstanding the divisional rate posted—at least in large numbers—by the visible facts relating to the company's general depot facilities at the city of destination, and would still look upon the flat rate named as inclusive of delivery, as well as of carriage. Passengers from New York, having paid their fare to Chicago, would feel outraged, if, once within the city limits, they were compelled to pay an additional so-called terminal charge, or disembark at a suburban station. The shipper of freight would experience the same feeling, if, in the absence of directions to the contrary, his goods were delivered at some place other than the carrier's general depot. The fact that a divisional rate was formally posted would not disabuse their expectations in time to adjust their course to the real rate thus imposed.

The law, in my judgment, upon considerations of public policy, comes to their rescue. It requires the carrier to do what, in view of this conception in the public mind, respecting travel and shipment— a conception natural and almost universal—the carrier ought, in good conscience, to do. An enforced single charge is no hardship to the carrier; it prevents infinite misunderstanding and inconvenience among its patrons. It is the only method that, treating the carrier fairly, at the same time fairly subserves the interests of the public. It is simply a recognition of an almost universal fact—a fact that is not undone by special provisions written into unnoticed tariff schedules. If the law, irrespective of the carrier's wish or contract, in subserving the public interests, interferes to impose a duty that the appliances shall be reasonably sufficient, and that the freight shall be carried in the customary mode, I can see no reason why, upon analogous motives, it should not recognize the convenience and the justice of the rule here insisted upon, and impose a duty in accordance.

The opinion of the majority, in substance, concedes this general proposition, but escapes its application to the case under consideration, by holding that live stock is an exceptional character of traffic; and that transportation to the stock yards is in the nature of a di-

version, in the interest of the shipper, from the carrier's general depot to the market designated by the shipper. In what respect the traffic is exceptional is not stated. It requires, of course, cars of a special character, and delivery facilities different from those provided for dead freight; but the difference between live stock and dead freight, in these respects, is not so wide as the difference between the equipment necessary to the carriage and delivery of passengers, and the equipment essential to the carriage and delivery of dead freight. Nor is the live stock shipped to Chicago a sporadic kind of traffic, turning up a car load to-day, and possibly not another car load for days to come; it is shown that more than three hundred thousand car loads of live stock (an average of one thousand car loads daily) come into the stock yards each year. No other single source of revenue to the railway companies is perhaps so large and so unfailing. This kind of exceptionalness, it seems to me, emphasizes rather than diminishes, the reason why the rule should be applied to live stock as well as to other freight.

The other reason stated for making live stock an exception—that it is a diversion, in the interest of the shipper, to the shipper's market—ignores the facts found by the Commission, and the undisputed history of the yards. When, in 1865, the yards were established, as the consolidated live stock station of the railway companies, there were at that place no packing houses and no established markets. The locality selected was in the country, centrally located, it is true, for the railways, but still unoccupied by any industry. In course of time, as doubtless the railways anticipated, a market grew up around the station. Here, as elsewhere in industrial evolution, like attracted like. The railways in establishing these yards did not go to the market; the market came to the railways.

As the general Chicago depot for the delivery of live stock, the stock yards remain to-day what they were the day of their establishment, only grown larger. It would be lawful doubtless to change this station, if it were done in substance, not in mere semblance; but the railway companies have not yet chosen to make the change. Why does it not remain their general depot for the delivery of live stock in as full a sense as upon the day it was first established before the surrounding industries had yet gathered; and in as full a sense as during the thirty years succeeding. Is it because the carriers do not own the chutes and pens and the intervening tracks; the same may be said of many passenger lines that come only to the city limits, passing from there over rails, and into the stations belonging to a terminal company. Is it because they pretend to be ready to deliver live stock from their own rails, should the shipper wish; that would be the substitution of a myth, known only on paper, for an actuality, known by the public at large. Is it because they have sold out their holdings in the yards and the intervening rails; that will not entitle them to divide the charge for a service between depot and depot. If, on the day the stock yards were established—before a market was there—they became the depot at which the shipper was entitled to have his stock delivered as a part of the service un-

dertaken, nothing has since transpired to change either the right of the shipper or the obligation of the carriers.

But assuming that the railways went to the markets and established their stations for delivery there, is it any the less, in the public mind, their general depot in Chicago for the delivery of live stock? It seems clear to me that the presence of a market about the stations—the only market of the kind in Chicago—must be taken as a forceful fact, definitely fixing, in the mind of the shipper, the locality of the delivery facilities. Where other than the stock yards, in view of these circumstances, would the shipper reasonably suppose his consignments would go? Would it not take the clearest character of information to convince him that, in the absence of a special direction, the cattle would be unloaded in some unknown place in the city? In this fact, that in the very nature of things live stock must go to the stock yards, will be found strong additional reason for, rather than against, the rule that there should be but a single charge from depot to depot, inclusive.

The general rule invoked is a salutary one, and should not be frittered away upon exceptions not founded upon cogent reasoning. Once open the door to exceptions on easy hinges, and a multitude will find their way in, until, indeed, the rule itself will have become the exception.