STICKNEY et al. v. INTERSTATE COMMERCE COMMISSION.

(Circuit Court, D. Minnesota, Third Division. June 30, 1908.)

1. CARRIERS (§ 26*) — INTERSTATE COMMERCE ACT — LEGALITY OF TERMINAL CHARGE.

Where railroad companies engaged in the transportation of live stock from points in other states to the Union Stockyards in Chicago have fixed a terminal charge for the moving of each car from the end of their own tracks in Chicago to the stockyards, stating the through rate to the end of their tracks and the terminal charge separately in their schedules, as required by section 6 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156], as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 [U. S. Comp. St. Supp. 1907, p. 895]), the legality of each charge must be determined by itself, without regard to the other; and where the terminal charge, considered by itself, is reasonable for the service rendered, the Interstate Commerce Commission is without power to reduce it on the ground that, when added to the through rate, the total charge from the point of shipment to the stockyards is excessive.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 70, 71; Dec. Dig. § 26.*]

2. COMMERCE (§ 91*)—INTERSTATE COMMERCE COMMISSION—POWER OF COURTS TO REVIEW ORDERS.

Under the provisions of sections 15 and 16 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3165], as amended by Act June 29, 1906, c. 3591, §§ 4, 5, 34 Stat. 589, 590 [U. S. Comp. St. Supp. 1907, pp. 900, 902]), the courts have jurisdiction to set aside or suspend any order of the Interstate Commerce Commission resulting from a misconception and misapplication of the law to conceded or undisputed facts.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 91.*]

In Equity. On motion for preliminary injunction.

William D. McHugh, for complainants.

L. A. Shaver and Samuel H. Cowan, for defendant.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. This is a bill in equity, brought by the railroad companies, which are complainants, against the Interstate Commerce Commission, to enjoin the enforcement of an order made by the latter requiring them to desist from charging $2 per car for transporting live stock brought from outside the state of Illinois, from the ends of their roads in Chicago to the Union Stockyards, and not to exact for that service hereafter a greater sum than $1 per car. The present submission is on a motion for a temporary injunction based on the bill, answer filed thereto, and exhibits filed with both, to restrain the enforcement of that order or to suspend its operation until a final hearing can be had on the merits. The case is brought on for hearing before three Circuit Judges by virtue of a certificate of the Attorney General made pursuant to the provisions of section 5 of the amended interstate commerce act (Act June 29, 1906, c. 3591, 34 Stat.

584 [U. S. Comp. St. Supp. 1907, p. 902]), and Act Feb. 11, 1903, c. 544, 32 Stat. 823 (U. S. Comp. St. Supp. 1907, p. 951).

The pleadings and exhibits disclose that since the year 1894 the Interstate Commerce Commission has frequently had the question of the above-mentioned terminal charge before it, and has repeatedly ordered its reduction from $2 per car to $1 per car. Under the original interstate commerce act of 1887 (Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), the orders of the commission were not self-executing, but required compulsory orders to that effect by a court of competent jurisdiction. Upon the railroads declining to obey the first order to reduce the charge the commission instituted a proceeding in the Circuit Court of the United States for the Northern District of Illinois to secure its enforcement. The trial court decided in favor of the commission, but its judgment was reversed on appeal by the Circuit Court of Appeals for the Seventh Circuit. Walker v. Keenan, 19 C. C. A. 668, 73 Fed. 755. Afterwards, upon a new case made, the commission again entered an order reducing the terminal charge from $2 to $1 and again sought its enforcement in the Circuit Court. Both the Circuit Court and the Circuit Court of Appeals for the Seventh Circuit decided against the commission and refused to enforce it. Interstate Commerce Commission v. Chicago, B. & Q. R. Co., 43 C. C. A. 209, 103 Fed. 249. Upon an appeal from the judgment of the Court of Appeals in the last-mentioned case the Supreme Court of the United States, in 1902, affirmed its judgment. Inter. Com. Commission v. Chicago, etc., R. Co., 186 U. S. 320, 22 Sup. Ct. 824, 46 L. Ed. 1182.

In February, 1903, the Cattle Raisers' Association of Texas and the Chicago Live Stock Exchange filed a petition asking the commission to open up the case again to enable them to conform to certain observations made by the Supreme Court. This was done, and resulted in a third order by the commission requiring the railroads to desist from exacting the terminal charge of two dollars. This decision was rendered in August, 1905. Nothing further seems to have been done until December 3, 1906, when, after the passage of the amendment to the interstate commerce act approved June 29, 1906 (34 Stat. 584, c. 3591 [U. S. Comp. St. Supp. 1907, p. 892]), known as the "Hepburn Act," the Cattle Raisers' Association of Texas and the Chicago Live Stock Exchange again complained to the commission that the complaining railroad companies had violated the provisions of the interstate commerce acts in laying the charge of $2 per car for the terminal service in question in Chicago. We suppose this additional proceeding was inspired by the Hepburn act, which made the orders of the commission conclusive, subject only to a court review as provided for by the fifteenth and sixteenth sections of the interstate commerce act as amended. On October 21, 1907, the commission again decided that the terminal charge of $2 per car was unjust and unreasonable, and thereafter, to wit, on December 10, 1907, made an order that such charge should not exceed $1 per car and fixed February 1, 1908, as the date when the order should go into effect. Under the new law (Act June 29, 1906, c. 3591, §§ 5, 6, 34 Stat. 589, 590 [U. S.

Comp. St. Supp. 1907, pp. 900, 902]) this order became effective proprio vigore at the time fixed by the commission therefor, and required obedience under heavy penalties, unless upon review by the courts at the instance of the railroads it should be enjoined, set aside, annulled, or suspended. Availing themselves of the right accorded by the act, the railroad companies now appeal to this court for relief against that last order.

In view of the protracted history of this case we find it unnecessary to restate many of the facts. By referring to the opinions of the courts already cited, and particularly to that of the Supreme Court of the United States in Interstate Com. Comm'n v. Chicago, etc., R. Co., supra, all essential detail can be found. For our present purposes it is sufficient to say that it stands conceded by the pleadings that the actual cost to complainants of carrying live stock from their respective terminal yards at the ends of their lines or roads in Chicago to the Union Stockyards exceeds the sum of $2 per car. This expenditure is for trackage from the ends of their rails over the track of the Union Stockyards & Transit Company and making deliveries of the stock at the stockyards and is for a service totally distinct and separate from that involved in the transportation over their own lines to the ends of their rails. As such terminal service it was required by the original interstate commerce act (Act Feb. 4, 1887, c. 104, § 6, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]), and by the amended act (Act June 29, 1906, c. 3591, § 2, 34 Stat. 586 [U. S. Comp. St. Supp 1907, p. 895]), that it should be separately scheduled by the carriers. The original act provided that the published schedules of rates, fares and charges, "shall also state separately the terminal charges," and the amended act emphasized this requirement by the use of the following language:

"The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers shall be carried and shall contain the classification of freight in force and shall also state separately all terminal charges, storage charges, icing charges and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect or determine any part or the aggregate of such aforesaid rates, fares and charges or the value of the service rendered the passenger, shipper or consignee."

Prior to 1894 the railroad companies made no additional charge for transporting live stock from their own terminals in the city of Chicago and delivering the same to the Union Stockyards. The rate fixed and charged for transportation from the points of origin of the freight to the ends of their own rails in Chicago included all the compensation they received for the service of delivery at the stockyards; but in that year the Union Stockyard & Transit Company made a trackage charge for the use of its tracks for that service ranging from 80 cents to $1.50 per car according to the extent of the track used by the different roads respectively. This additional burden and the enhanced complexity and general cost of the special service, according to the averments of the bill, "made it impracticable to continue to make deliveries beyond the lines of their respective railroad tracks without any charge or compensation therefor." For these reasons, as averred, the rail-

road companies laid a charge for it of one uniform price of $2 per car and undertook to conform their published schedule of rates and charges thereto.

This was the condition of things as the case stood when heard by the Court of Appeals for the Seventh Circuit and the Supreme Court. The Court of Appeals twice justified the imposition of the extra charge on the ground, generally speaking, that the carriers had a right to segregate the terminal charge in question from the other rates over their main lines, and had done so, and that they had a right to make an additional charge, not exceeding the cost thereof, for that service, and that the charge of $2 a car as laid was just and reasonable and should be sustained. See cases supra. The Supreme Court held that the carriers had the right to divide their rates, so as to make a distinct charge for service from the point of shipment to Chicago and a separate charge for service in transporting and delivering live stock from their own terminals to the Union Stockyards, but held that they had not made such a division by any such clear and plain statement as is required by the interstate commerce law. After referring to the provision of law requiring the separate statement of terminal charges, the court said:

"The purpose of this provision was to compel the schedules to be so drawn as to plainly inform of their import—was to exact that, when the rates were changed, the change should be so stated as not to mislead and confuse."

The conclusion reached was that the carriers in this case had not made the required division and separate statement of their terminal charges; that all they had done was to add the sum of $2 to the prior through rate, which up to that time had embraced the terminal charge. Mr. Justice White, speaking for the court, said:

"We think that it cannot be said that to add an additional amount to a former charge was necessarily to divide such former charge, without holding that to add one sum to another is necessarily to divide the other."

Notwithstanding this conclusion, the judgment of the Court of Appeals was affirmed on other grounds. The opinion concludes as follows:

"We think, however, in view of what has been said, and in order to prevent all possible misconception, that it should be stated that nothing in the decree refusing to execute the order of the commission should be construed as preventing that body, if it deems it best to do so, from hereafter commencing proceedings to correct any unreasonableness in the rate resulting from the additional terminal charge as to any territory to which the reduction referred to in the opinion, if any such there be, did not apply."

Adopting the suggestion of the Supreme Court, the carriers soon thereafter made an amendment of their published and filed schedules, and by clear and unequivocal language segregated the terminal service from the transportation over their main lines to Chicago, and definitely fixed the rate for the separated terminal service at $2 per car.

In view of the right and duty of the carriers to make a segregation, and of the fact that one has been actually made, and of the further fact that the charge laid for the separate terminal service is

in itself just and reasonable, not more than the actual cost thereof, it would seem to follow that it should not be reduced. Neither the commission in its reports nor learned counsel in their argument attempt to justify the reduction on the ground that the charge as actually laid was too much for the particular service rendered, but solely on the ground that if the charge of $2 a car for the terminal service should be allowed, even though it be only a just and reasonable compensation therefor, the result would be that the rate from the origin of shipment to the ends of the rails in Chicago would become too high, and thereby the cost of transportation from the origin of shipments to the Union Stockyards would be excessive.

It is said that the carriers for many years before 1894 made no separate charge for the terminal service in question, but absorbed it in the though rate, and that the present published and filed rate for the service on the main lines only—that is, the service to the end of complainants' lines in Chicago, excluding the terminal service—is the same as it then was. The conclusion drawn is that because the carriers are now charging $2 more than they once admitted was just and reasonable for the entire transportation, including the terminal service, the imposition of the terminal charge is a mere unwarranted addition to a just and reasonable charge, and is accordingly in itself unjust and unreasonable.

The logic of this argument is somewhat impaired by the concession that the carriers may, by reason of the trackage charge, ranging from 80 cents to $1.50 per car, made by the Union Stockyard & Transit Company, add to the through rate the arbitrary sum of $1 per car for a terminal charge. If the old through rate is not conclusive of the reasonableness of the terminal charge, it is obviously left open to every consideration affecting its reasonableness. Not only the trackage charge, but the other facts which create the complexity and affect the general cost of the terminal service referred to in the bill, should be considered.

The interstate commerce law confers the power upon carriers to determine for themselves the rate of freight between points on their lines and the terminal and other charges which they will make for services beyond their lines incident to transportation, and imposes upon them the duty of stating them separately in their schedules, which are required to be published for the information of patrons. Carriers may in this manner make such propositions for business as they please; but when they make them they must, until they are changed by themselves or by the commission, strictly observe them or suffer the pains and penalties of the law for disobedience. In the exercise of their power and obedient to their legal duty the carriers fixed and published the terminal charge in question for service beyond their lines rendered necessary to complete the transportation undertaken by them. They made this a separate matter, as they had the undoubted right under the law to do, and in our opinion neither the commission nor the courts have a right to complicate it with any other service in determining the reasonableness of a charge fixed for it.

The various provisions of the interstate commerce law requiring separate statements and schedules of all kinds of service and imposing

penalties for failure to observe them seem to us to necessarily place them apart and make each stand by itself when assailed as unlawful. This, of course, does not prevent consideration of all pertinent surrounding circumstances when any particular service is drawn in question.

It follows, we think, that the reduction of the terminal charge below its cost, or below its just and reasonable value, for the purpose of correcting the through rate, was erroneous. The commission, in our opinion, had no power, after the legal separation of the two services, to make the terminal charge unreasonably low, merely because the tariff for the through rate was unreasonably high. If the latter were true, the remedy was to reduce it by a direct proceeding instituted for that purpose, rather than by the indirection involved in reducing the charge for another connecting, but separate, service which was just and reasonable in itself. On the conceded facts of this case we think the commission misconstrued the law.

But it is argued that the power to prescribe maximum rates for service is conferred upon the commission exclusively; that when, in its opinion, an existing rate is unreasonable, the power to prescribe a maximum rate for two years to come arises; and, whether the opinion reached by the commission be right or wrong, that it is not under any circumstances reviewable by the courts.

With this contention we find ourselves unable to agree. As a result of the well-remembered, protracted, and able debates in Congress when the Hepburn bill was under consideration, concerning the question of a judicial review of the work of the commission, the following provisions were embodied in the act:

"Sec. 4. All orders of the commission except orders for the payment of money shall take effect within such reasonable time not less than thirty days and shall continue in force for such period of time not exceeding two years as shall be prescribed in the order of the commission unless the same shall be suspended or modified or set aside by a court of competent jurisdiction.

"Sec. 5. The venue of suits brought in any of the courts of the United States against the commission to enjoin, set aside, annul or suspend any order or requirement of the commission shall be in the district," etc., "and jurisdiction to hear and determine such suits is hereby vested in such courts:  *  *  * Provided, that no injunction, interlocutory order or decree suspending or restraining the enforcement of an order of the commission shall be granted except on hearing after not less than five (5) days notice to the commission."

The defendant is a legislative commission, empowered to discharge certain legislative duties—among others, to determine and prescribe what are just and reasonable rates for carriers of interstate commerce to charge for the different kinds of service which they are authorized to perform for the public; that is, to determine and prescribe what may be the maximum of their charges for through transportation, terminal, storage, icing, and other services incidental to transportation, which they print or publish in their schedules, to be performed by them. Being a commission of the character mentioned, we at least perceive no reason for giving its proceedings and conclusions greater efficacy than is accorded to those of quasi judicial bodies, created to perform duties involving inquiry into facts and application of law thereto. The finding of facts on controverted and conflicting evidence by such

bodies, when not brought about by fraud or mistake, is generally con-
clusive, and ought not to be disturbed by the courts; but when facts
found, conceded, or established without dispute admit of but one legal
conclusion, and a different and erroneous one is reached by reason of
a misconception and misapplication of law by such bodies, their ac-
tion is subject to review, and may and ought to be avoided by the
courts. James v. Germania Iron Co., 46 C. C. A. 476, 107 Fed. 597;
Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485; Moore v. Robbins,
96 U. S. 530, 21 L. Ed. 758.

We refrain from expressing any opinion concerning what other ju-
risdiction, if any, is conferred upon this court by the broad and com-
prehensive language of the Hepburn act, authorizing it "to enjoin, set
aside, annul or suspend any order or requirement of the commission."
All we are required now to hold, and all we do hold, is that this court
has ample jurisdiction to set aside or suspend any order of the com-
mission resulting from a misconception and misapplication of a law
to conceded or undisputed facts.

Applying the foregoing doctrine to the facts of this case, we think
the learned commission fell into a mistake of law in attempting to
correct the through rate by reducing the terminal charge itself below
its just and reasonable value. That being a separable and separate
service, actually segregated by proper action of the carriers from the
rate over their main lines, it must, in our opinion, stand or fall upon
its own merits, irrespective of whether the other rates are in them-
selves just and reasonable. If they are not just and reasonable, ap-
propriate proceedings should be instituted to make them so. Such,
we think, is the meaning of the Supreme Court expressed in the lat-
ter part of its opinion in Int. Com. Comm. v. Chicago, etc., R. Co., su-
pra. It there reserved the right to the commission "to commence pro-
ceedings to correct any unreasonableness in the rate resulting from the
additional terminal charge," etc. If, by the separation of and separate
charge for the terminal service, the balance of the rate from the origin
of shipment to the stockyards is, in the light of former charges or for
any other reason, too high, the remedy should be applied directly to it,
without disturbing the rate, which is not too high.

Counsel for the commission again suggest, rather than seriously
argue, we think, that no rate prescribed by the commission for any
service can be set aside or suspended unless the complaining carriers
make it appear that the enforcement of the rate challenged will render
the business of the carriers throughout their whole line unprofitable.
Our attention is called to the case of St. L. & San Francisco Railway
v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567, as authority for
this suggestion. Without stopping to analyze the Gill Case, to show
its inapplicability to the case before us, or to consider the proposition
advanced by counsel at any length, we content ourselves by saying that
it seems utterly untenable. The provision of the interstate commerce
law requiring carriers to segregate certain incidental services ren-
dered by them from the principal service of transporting merchandise
over the main lines of their roads, and requiring them to affix thereto
a distinct and separate charge, which in itself must be just and rea-

sonable, is inconsistent with counsel's suggestion. We cannot conceive that Congress ever intended by the legislation in question to subject railroad companies to the necessity of an accounting concerning all their business throughout their entire lines, in order to secure proper compensation for an icing, elevating, or terminal service. An intention involving such an impracticable result should not be lightly imputed to Congress.

Some other arguments are made in support of the contentions of each side, all of which have received careful consideration; but, as the result reached by us necessarily follows from what has already been said, we refrain from prolonging this discussion further. The temporary injunction prayed for, suspending until the further order of this court the order of the commission reducing the terminal charge in question from $2 to $1, will be made; but we will require as a protection to shippers that the several complainants keep an accurate record showing the number of cars of live stock transported by them, respectively, over the terminal road in question to the Union Stockyards, together with the dates of such transportation, the names of the respective consignors and consignees, the charges made by the respective complainants for such terminal service, and the charges prescribed therefor at the time such service may be rendered by the Interstate Commerce Commission, and hold the same subject to such orders as this court may hereafter make with respect thereto. We shall also require that complainants furnish a bond, in the penal sum of $100,000, conditioned that they will comply with the orders made upon them and pay such damages as shippers may sustain by reason of the injunction.